1  JACK RUSSO (State Bar No. 1746957)
   COMPUTERLAW GROUP LLP
2  401 Florence Street
   Palo Alto, CA 94301
3  Telephone: (650) 327-9800
   Facsimile: (650) 618-1863
4  E-mail: jrusso@computerlaw.com

5  Attorney for Plaintiff
   FRANCES WEBER
6

7                    UNITED STATES DISTRICT COURT

8                    SOUTHERN DISTRICT OF NEW YORK

9

10

11  FRANCES WEBER, an individual,            Case No.: 13-cv-7437 (ER)

12                                           **SECOND AMENDED COMPLAINT FOR:**
                    Plaintiff,               1.  **SECURITIES FRAUD;**
13                                           2.  **CONSTRUCTIVE FRAUD;**
                    v.                       3.  **DECEIT;**
14                                           4.  **NEGLIGENT MISREPRESENTATION;**
    ARTICLE ONE PARTNERS HOLDINGS, LLC, a    5.  **BREACH OF CONTRACT;**
15  Delaware limited liability company; AOP  6.  **BREACH OF FIDUCIARY DUTY;**
    FOUNDERS, LLC, a New York limited liability 7. **VIOLATIONS OF NEW YORK LABOR**
16  company, CHERYL MILONE, an individual, SYW     **CODE §191(3);**
    PRIVATE INVESTMENT LLC a Delaware limited 8. **BREACH OF WRITTEN**
17  liability company, and ALLEGHANY CAPITAL      **EMPLOYMENT CONTRACT;**
    CORPORATION, a Delaware corporation,     9.  **WRONGFUL TERMINATION IN**
18                                               **VIOLATION OF THE FAMILY**
                                                 **MEDICAL LEAVE ACT OF 1993, 26**
19                  Defendants.                   **U.S.C. §2601 *ET SEQ.*;**

20                                           **[JURY TRIAL DEMANDED]**

21

22

23

24

25

26

27

28

#### NATURE OF ACTION

1.     In this action, Plaintiff Frances Weber ("Ms. Weber") seeks damages and equitable relief for securities violations, negligent misrepresentations, breaches of fiduciary duty and written contract, and wrongful termination by Defendants Cheryl Milone ("Ms. Milone"), Article One Partners Holdings, LLC ("AOP"), AOP Founders, LLC ("AOP Founders"), jointly and severally, along with Defendants SYW Private Investment LLC ("SYW") and Alleghany Capital Corporation ("Alleghany"). Through deceit and misrepresentations of material facts, Defendants fraudulently induced Ms. Weber, an unaccredited individual investor, to invest over $50,000 in AOP by promising at various times and among other misrepresentations that Ms. Weber would receive a total of 11.2% equity in AOP and AOP Founders.

2.     Ms. Weber also seeks damages on violations of written and oral contracts and New York Labor Code for wrongful termination of her employment with AOP.

#### JURISDICTION AND VENUE

3.     This action arises under the Securities Exchange Act of 1934, 15 U.S.C. §78a et seq. This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. Section 78aa. Venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendant AOP has its main corporate offices in this District. 28 U.S.C. §1391(b)(2). The Court has supplemental jurisdiction pursuant to 28 U.S.C. Section 1367 over Ms. Weber's pendent claims.

#### PARTIES

4.     AOP, a limited liability company incorporated in Delaware, is a start-up company in information services, overseeing and managing research and strategic patent analyses.

5.     AOP Founders is a New York limited liability company and a related company to AOP.

6.     Ms. Weber is a New York resident and a founding member of AOP, and served as its Executive Vice President of Research from its founding in November 2007 until December 31, 2011.

7.     Ms. Milone is a New York resident and a founding member, Chief Executive and Managing Member of AOP. She is also, on information and belief, the controlling member of the

//

1  majority stakeholder in AOP LLC, a Delaware limited liability company, which is itself a stakeholder

2  in AOP.

3    8.    SYW Private Investment, LLC is a Delaware limited liability company, and an investor

4  and member of AOP.

5    9.    Alleghany Capital Corporation is a Delaware corporation, and is an investor and

6  member of AOP.

7                          BACKGROUND FACTS

8    10.    Between 2007 and 2012, Ms. Milone, AOP and AOP Founders, through their managing

9  member Ms. Milone and other agents, induced Ms. Weber to invest in AOP and AOP Founders at

10  various times, for a total amount of $50,000.

11    11.    In order to induce Ms. Weber, an individual and a non-accredited investor, to make

12  these investments, Ms. Milone, AOP and AOP Founders made certain representations as to the size of

13  the equity stake which Ms. Weber would receive in exchange for her money, including

14    A.    false promises in Spring of 2008 by Ms. Milone that if Ms. Weber joined the company

15        as a founder, she would receive at least a 1% ownership interest in the company;

16    B.    written statements on December 23, 2008 that Ms. Weber was granted an additional

17        100,000 shares in the company in exchange for her work with the company;

18    C.    additional statements in February 2009 that the company required an immediate

19        investment of $50,000 from Ms. Weber to avoid bankruptcy;

20    D.    statements asserting that with the value of this $50,000 investment, Ms. Weber would

21        acquire an additional 0.5% to increase her then 5% stake to a 5.5% interest in the

22        company, with additional statements that this 5.5% stake would be doubled to 11%

23        ownership of AOP, in addition to the 100,000 shares in AOP Founders from the

24        December 23, 2008 grant;

25    E.    numerous promises that the AOP LLC would be converted to a corporation;

26    F.    repeated representations that Ms. Weber would be provided with stock certificates for

27        these shares; and

28

G.     representing to Ms. Weber in September 2009 that in order to obtain financing for the company, Ms. Weber would have to convert her ownership to "stock options," and that unless she did so, there would be no way to close the transaction and save the company.

### MS. WEBER'S OWNERSHIP STAKE AND SECURITIES CLAIMS

12.    In 2008, Ms. Weber bought her 1% founder's stake in AOP. This stake increased in AOP to 5% specifically, in Summer of 2008, Ms. Weber's time commitment to the company increased substantially, due to Ms. Weber spending many more hours working on researching data for pharmaceutical patent cases for use in the AOP investment analytics. As a result of this increased commitment, Ms. Weber discussed with Ms. Milone the necessity of increasing Ms. Weber's financial stake in AOP. Ms. Milone told Ms. Weber that she knew that Ms. Weber was essential to the success of AOP and that Ms. Weber would receive a significant stake in the company, or words to that effect, resulting in the increase of her 1% stake in AOP to 5%. Ms. Weber continued to work on the development of the website and identifying pharmaceutical patent litigation cases as potential investment opportunities.

13.    In Fall 2008, after the successful launch of the AOP website, a project to which Ms. Weber devoted considerable time, Ms. Milone and Ms. Weber continued to have discussions on this promised increased financial stake in AOP. In December of 2008, Ms. Milone verbally told Ms. Weber that Ms. Weber would be gainfully employed for as long as AOP existed, or words to that effect. She also represented that, as Ms. Weber had been so critical to the development of the website, the selection of the studies, and the review of the prior art submissions, that she would personally guarantee that Ms. Weber would have a significant stock position in the company. Ms. Milone stated that as Ms. Weber had not invested money, Ms. Weber could not be labeled a co-founder of Article One but that the company would not have been successfully launched without her.

14.    Ms. Milone confirmed her commitment to Ms. Weber in an e-mail dated December 23, 2008 in which she also awarded Ms. Weber 100,000 shares of stock. At the time, Ms. Weber believed that the stock was for AOP. Ms. Weber has subsequently learned that this may be a stock position in a related company, Article One Founders LLC.

1    15.    On February 14, 2009, in a meeting at Ms. Milone's apartment, Ms. Milone advised Ms.

2  Weber that unless Ms. Weber was able to come up with $50,000 to invest in AOP, the company would

3  be closed and file for bankruptcy. Ms. Milone told Ms. Weber that in return for this investment, Ms.

4  Weber would be assured of gainful employment as long as AOP existed and that she would personally

5  double the stock position that Ms. Weber currently had. At that time, Ms. Weber had a 5% stake in

6  AOP. The $50,000 would purchase an additional 1/2%. While Ms. Weber understood that Ms.

7  Milone was guaranteeing that the entire 5.5% would be doubled, ostensibly, AOP has asserted that

8  only the original 5% stake was doubled.

9                                    *Summary of Ownership Interests*

| **AOP** | **Total Equity** | **AOP Founders LLC** | **Equity** |
|---|---|---|---|
| 2008 Founder's Shares: $100 | **1%** | | |
| 2008 4% increase in Founders' Shares | $1\% + 4\% =$ **5%** | December 23, 2008 Grant | 100,000 shares |
| February 14, 2009 $50,000 Investment: additional 0.5%, then entire stake doubled | $2(5\% + 0.5\%) =$ **11%** | | |

17    16.    In September 2009, returning from San Diego, California, where AOP had presented at

18  the 2009 DEMO Exposition, Ms. Milone advised Ms. Weber that the "Angel" group of investors, led

19  by Christopher Wang, would not invest at all unless any stock that Ms. Weber had received was

20  converted to options. Other than an Employment Agreement (Exhibit 5) which provided a

21  complicated formula for the strike price of such options, Ms. Weber did not receive any paperwork

22  regarding the conversion of stock into options.

23    17.    Ms. Weber told Ms. Milone that options were of no use to her, no matter what the strike

24  price was, as Ms. Weber was certainly not in a financial position to be able to exercise those options.

25  Ms. Milone reiterated that Ms. Weber would always be an employee of AOP, and that Ms. Weber

26  would never be required to exercise the options except as part of an initial placement offering. Ms.

27  Milone's explanation as for why the Angel group (SYW) was concerned was that they were worried

28  that Ms. Weber would be able to leave the company and still own stock. The SYW angel investors,

Ms. Milone, and AOP together schemed to strip Ms. Weber and Ray Felts (another initial executive who has since left) of their outright ownership interests in AOP and convert them to options.

18. Ms. Weber proposed that AOP make a counteroffer including employment agreements that had significantly stronger non-compete provisions. Ms. Milone said that this would not be acceptable. In an emotional discussion, in the taxi on the way to the airport, Ms. Milone asserted Ms. Weber did not understand the concept of a stock option. Ms. Weber stated that rather, she was concerned she would never be able financially to exercise those options, and thus would never see any value for all the work that she had performed for AOP.

19. Once at the airport gate, Ms. Milone and Ms. Weber sat apart. However, shortly thereafter, Ms. Milone approached Ms. Weber and stated that she understood Ms. Weber's concerns, but that she had discussed this provision many times with Mr. Wang and that his Angel group was adamant. However, she again personally committed to Ms. Weber that she would always have employment as an officer of AOP and thus would always be in a financial position to exercise the options.

20. In early 2010, Paul DiGiammarino, who had joined AOP as President, introduced Alleghany as potential investors to AOP. Alleghany likewise demanded that AOP revise Ms. Weber's ownership to ensure Alleghany's liquidity preference on investing in AOP. None of this information was disclosed to Ms. Weber. Although Ms. Weber was assured that she held an "executive" position in AOP, she was not included in numerous executive meetings. Often, she would not learn that such meetings had occurred until after they had taken place and executive decisions had been made.

21. In May of 2010, while AOP was performing due diligence for the investment by Alleghany, Ms. Weber reminded Ms. Milone that she had still not received any documentation for the converted stock options. Ms. Weber was told that the documentation would be forthcoming, as soon as the Alleghany funding closed. However, Ms. Weber did not receive any documentation until November 2011.

22. In so doing, Defendants, individually and together, affirmatively misrepresented the value of the ownership interest in AOP and AOP Founders which Ms. Weber would obtain in exchange for capital investment and the investment of her time and resources as a founder, officer, and

1  employee of the companies, and actively concealed or suppressed pertinent facts to prevent Ms. Weber
2  from learning the truth about how the form, percentage, and value of her ownership interest would be
3  affected by the funding agreements and transactions between AOP and AOP Founders, on the one
4  hand, and other investors, including SYW and Alleghany, on the other.

5      23.    By 2011, Ms. Weber and Defendants AOP, AOP Founders, and Ms. Milone had entered
6  into multiple binding written and oral agreements, including the written August 7, 2007 Subscription
7  Agreement (**Exhibit 1**), the May 20, 2008 Operating Agreement of Article One Partners, LLC
8  (**Exhibit 2**), the December 23, 2008 grant of 100,000 shares in Article One Founders, LLC by Ms.
9  Milone (**Exhibit 3**), and the Second Amended and Restated Limited Liability Agreement of June 17,
10 2010 (**Exhibit 4**) (collectively, the "Agreements"), to grant Ms. Weber a 11% membership interest in
11 AOP, and an equivalent share of stock in the company when it converts to a corporation, as well as her
12 100,000 shares of AOP Founders, all in return for Ms. Weber's investments of money, time, and work
13 as a founder, employee, and investor of AOP and AOP Founders. True and correct copies of the
14 Agreements are attached as **Exhibits 1-4**[1].

15     24.    Contrary to these promises and representations, AOP now maintains that Ms. Weber's
16 total equity amounted at most to a 1% stake in AOP, and none at all in AOP Founders, and that,
17 moreover, the equity was in the form of options which Ms. Weber would have had to exercise to
18 secure.

19     25.    As well as being an investor in AOP and AOP Founders, Ms. Weber was an employee
20 of AOP from its founding in November 2007. On January 1, 2009, Ms. Weber and AOP entered into a
21 formal agreement ("Employment Agreement"), attached as **Exhibit 5**, under which AOP employed
22 Ms. Weber as an executive vice president of research. The Employment Agreement was drafted
23 entirely by AOP and is governed by New York Law. Ex. 5, §11.

24     26.    As an employee of AOP, Ms. Weber was entitled to $125,000 per year of employment,
25 a performance-based bonus, and, in the event of discharge other than for "cause", a severance payment
26 equal to three months' of salary. Ex. 5, §§2, 3, 7. Ms. Weber was employed by AOP for four years, and
27

28 [1] These Exhibits have been designated confidential by either Defendants or Plaintiff. Plaintiff is
   seeking a stipulated protective order to permit these Exhibits 1-4 to be filed under seal.

Computerlaw
Group LLP
computerlaw.com

Second Amended Complaint          6          Case No. 13-cv-7437 (ER)

1  entitled to, at minimum, $500,000 under the Employment Agreement. Once Ms. Weber began
2  receiving a salary in late October 2009, she was granted an increase in salary each subsequent year.

3      27.    In the Spring of 2011, after being excluded from many of the critical executive
4  decisions at AOP, Ms. Weber asked to be allowed to leave the company. AOP agreed that Ms. Weber
5  could leave and asked if Ms. Weber would stay long enough to assist in hiring and training a Director
6  of Research. AOP represented that no one person would be able to handle the multitude and breadth of
7  responsibilities carried out by Ms. Weber, but as the research management was the most significant
8  component of her position, AOP would need someone in this capacity prior to allowing Ms. Weber to
9  amicably leave the company. Ms. Weber agreed to do so. In order to have an orderly transition, AOP
10 retained the services of Paul DiGiammarino to negotiate a plan of separation. Negotiations resulted in
11 a contract entitled "Heads of Agreement."

12     28.    In August 2011, Ms. Weber was approached by Paul DiGiammarino, president, and
13 Richard Schwartz, COO, and asked if she would agree to stay. They stated that they did not wish for
14 someone with her expertise and knowledge to leave the company. If she agreed, Ms. Weber would be
15 able to take the planned sabbatical and return to work January 1 with new responsibilities. In order to
16 induce her to stay, Ms. Milone agreed to pay Ms. Weber $300,000 at the time of any initial placement
17 offering, as long as Ms. Weber was still an employee of the company. This new agreement was signed
18 on September 2, 2011 by Ms. Weber and, on behalf of AOP, by Paul DiGiammarino ("Heads of
19 Agreement"). **Exhibit 6** is a true and correct copy of the Heads of Agreement.

20     29.    Under this Agreement, Ms. Weber would be given an opportunity to do a cashless sale
21 of her stock options when Alleghany conducted a second round of funding. Ms. Weber was assured by
22 Paul DiGiammarino that Alleghany, his friends and long-time business colleagues with whom he had
23 conducted other investments, was financing the second round of funding. The Agreement also
24 provided that Ms. Weber would be taking a three-month sabbatical after she had completed training
25 her replacements. The search for the replacement was lengthy, and the sabbatical began in October
26 2011.

27     30.    One of the guarantees AOP made to Ms. Weber under the Heads of Agreement was that
28 when the next funding opportunity for AOP materialized, Ms. Weber would be allowed to sell some of

1  her equity in order to recoup the money she had lost when she had to withdraw money from her
2  retirement account, incurring penalties, to invest in AOP.

3      31.    On information and belief, AOP had previously allowed an executive and officer, Ms.
4  Milone, to cash out some of her holdings, selling $150,000 shares to Mr. Giammarino. Ms. Weber was
5  not invited to participate in this opportunity to sell securities.

6      32.    In November, during her sabbatical, Ms. Weber received an e-mail request that Ms.
7  Weber sign a "release". The release did not include any of the terms from either the Heads of
8  Agreement or the September Agreement, including, notably, the $300,000 payment Ms. Milone agreed
9  to make on its next round of funding and the opportunity to liquidate equity. At this time Ms. Weber
10  asked when Alleghany would be closing the second round of funding. Paul DiGiammarino advised Ms.
11  Weber that Alleghany had decided not to do a second round and that the company was looking for
12  other investment sources.

13      33.    During November and December 2011, Ms. Weber continued to discuss the terms of
14  the proposed release with Monica Winghart, General Counsel for AOP. The Heads of Agreement
15  provided that Richard Schwartz and Ms. Weber were to negotiate the range of responsibilities for
16  which Ms. Weber would be responsible upon her return to AOP on January 2, 2012.

17      34.    At this time, AOP's officers and directors represented to Ms. Weber that Alleghany had
18  decided not to invest. Alleghany agreed to delay its funding period while the issues with Ms. Weber
19  were being manipulated by this deception. All Defendants acted with the intent to defraud Ms. Weber
20  by deferring the finalization and announcement of the Alleghany second investment until after Ms.
21  Weber either had been convinced to sign the release, or had been terminated.

22      35.    Although during the final week of December 2011, it appeared that the parties had
23  agreed upon the terms, Ms. Weber received a letter from AOP terminating her employment as of
24  December 31, 2011. AOP gave no reason for terminating Ms. Weber.

25      36.    On information and belief, the December 31, 2011 date was selected because the final
26  third of Ms. Weber's options were to vest on January 1, 2012. Further, in the last two months of 2011,
27  AOP and Alleghany had reached agreement as to Alleghany's investment in the next round of funding
28  in AOP. To avoid paying Ms. Weber the $300,000 Ms. Milone had agreed to pay her upon this

1    investment, AOP, Alleghany, and SYW decided to fire Ms. Weber. Ms. Weber had refused to sign the

2    release designed to avoid this obligation, so instead, AOP terminated her.

3       37.     In February 2012 there was a public announcement issued by Article One that

4    Alleghany had completed a second round of funding for the company. This was directly contrary to the

5    information that Paul DiGiammarino had provided to Ms. Weber in November 2011, and others in

6    December 2011, at the direction of Alleghany and AOP.

7                                **FURTHER EMPLOYMENT DISPUTES**

8       38.     Ms. Weber received compensation for her efforts in 2008 only as a member of the LLC.

9    As an employee of AOP, Ms. Weber's salary from 2009 to 2011 was as follows:

| Year | Base Salary<br>*Promised but<br>not paid |
|------|----------------------------------------|
| 2009 | $125,000 |
| 2010 | $150,000 |
| 2011 | $160,000 |

      39.     Ms. Weber was not compensated anywhere near that rate, but as a result of the

haphazard bookkeeping by AOP, and AOP and AOP Founders' failure to provide her with the tax

returns and documentation she has requested, she has not been able to determine the full extent to

which she was underpaid.

      40.     At the time Ms. Weber's employment was terminated on December 31, 2011, at least

$200,000 of Ms. Weber's total salary remained unpaid. AOP failed to pay this amount as required by

New York Labor Code section 191(3), which sets a statutory deadline for timely payment not later

than one month after her termination, according to the contractual pay period in the Employment

Agreement.

      41.     In March 2012, Ms. Weber filed a demand for arbitration of her employment claims

against defendants. **Exhibit 7** is a true and correct copy of Ms. Weber's original arbitration demand

seeking the following relief:

      (a) Declaratory relief in the form of a

         i.    Declaration of Weber's fully vested ownership of 11% in AOP, LLC;

1        ii. Declaration of Ms. Weber's fully vested ownership of 100,000 shares in AOP Founders,

2            LLC;

3        iii. Declaration of Ms. Weber's rights to all shareholder and all financial information.

4        iv. Declaration of rights to reasonable severance for wrongful termination;

5        v. Declaration of rights to an accounting of all income and expenses of Article One

6            Partners, LLC.

7    (b) Statutory wage and wrongful termination claims;

8    (c) Punitive and exemplary damages;

9    (d) Interest; and

10    (e) Attorneys' fees and arbitration costs.

11    42.    However, in September 2012, Defendants (as Respondents in the arbitration), moved

12  for a determination by the Panel that none of Ms. Weber's statutory wage and wrongful termination

13  claims, or claims for punitive/exemplary damages, interest, or fees and costs, were arbitrable. The

14  Panel ruled in Defendants' favor, and dismissed Ms. Weber's employment claims stating:

15        The Motion to dismiss the Fourth Claim is GRANTED. This claim is for wrongful termination
            of an employment agreement. That employment agreement does not contain an agreement to
16      arbitrate disputes that might arise thereunder. To the contrary, it specifically directs the parties
            to the courts to resolve such disputes: "Any dispute shall be resolved within the courts located
17      in the State of New York". The parties themselves made a clear and dispositive choice to
            resolve disputes under the employment agreement in court and not in arbitration.

18  Thus, Ms. Weber's claims were dismissed from the arbitration by Order of the Tribunal on September

19  21, 2012. A true and correct copy of this Order is attached as **Exhibit 8.**

20    43.    In October 2012, Ms. Weber sought to amend her arbitration demand to include claims

21  for securities fraud, constructive fraud, deceit, negligent misrepresentation, breach of contract, and

22  breach of fiduciary duty. A true and correct copy of this Amended Demand is attached as **Exhibit 9.**

23    44.    Defendants (as Respondents) opposed Ms. Weber's Amended Demand, arguing:

24        good cause does not exist because the parties extensively briefed the issue of the arbitrability of
            Claimant's original claims and the Arbitrators already ruled upon that issue to determine what
25      claims are in the arbitration and what claims are not, and **at least some of the claims and**
26      **remedies Claimant seeks in her amended claims are not arbitrable.**

27  [Emphasis added]. **Exhibit 10** is a true and correct copy of Defendants' October 26, 2012 Objection to

28  Ms. Weber's Amended Demand.

1    45.    At the telephonic hearing on the motion, Ms. Weber's counsel represented that Ms.

2    Weber would be willing to accept any change in the schedule for arbitration to accommodate these

3    new claims, including an adjournment or continuation to prevent any prejudice. Yet, on November 14,

4    2012, the Panel ruled in Defendants/Respondents' favor, ordering that Ms. Weber's Amended Claims

5    would not be heard in arbitration. A true and correct copy of the Panel's Procedural Order No. 2, dated

6    November 14, 2012 is attached as **Exhibit 11,** and reflects the Panel's misunderstanding of Ms.

7    Weber's willingness to accept a change in arbitration scheduling.

8    46.    As a result of these procedural rulings, in which the Panel adopted the position taken by

9    Defendants/Respondents by ruling in their favor, none of Ms. Weber's statutory wage, wrongful

10   termination, or other employment claims, and none of her claims to recover damages from Defendants

11   for fraud, securities fraud, deceit, negligent misrepresentation, breaches of contract, and breaches of

12   fiduciary duty were given a hearing on their substance or merits in any way.

13                         **FIRST CLAIM FOR RELIEF - SECURITIES FRAUD**
                  **Against Article One Partners Holdings, LLC, AOP Founders, LLC,**
14                **Cheryl Milone, SYW Private Investment LLC and Alleghany Capital Corp.**

15   47.    Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-46.

16   48.    Ms. Weber is a purchaser of securities under section 10(b) of Securities Exchange Act

17   of 1934 because she has entered into various contracts with AOP, AOP Founders, and Cheryl Milone

18   to invest in AOP and AOP Founders. The securities purchased by Ms. Weber include her 1%

19   ownership stake in AOP, her 10% ownership stake in AOP which were illegally converted options, and

20   the 100,000 shares in AOP Founders, LLC granted to Ms. Weber by Ms. Milone in recognition of her

21   performance in building AOP.

22   49.    AOP, AOP Founders, and Ms. Milone engaged in a fraudulent scheme to misrepresent

23   or conceal material facts in connection with Ms. Weber's investment in AOP and AOP Founders and

24   to induce Ms. Weber to purchase the stock of AOP and AOP Founders, including misrepresenting the

25   value of the investment Ms. Weber made in AOP and AOP Founders by making statements to Ms.

26   Weber which included (i) false promises in Spring of 2008 by Ms. Milone that if Ms. Weber joined the

27   company as a founder, she would receive at least a 1% ownership interest in the company for her $100

28   purchase; (ii) written statements on December 23, 2008 that Ms. Weber was granted an additional

1   100,000 shares in AOP Founders in exchange for her work with the company; (iii) additional

2   statements in February 2009 that the company required an immediate investment of $50,000 from Ms.

3   Weber to avoid bankruptcy; (iv) statements asserting that with the value of this $50,000 investment,

4   Ms. Weber would increase her 5% interest to 5.5% interest, which would then be doubled for 11%

5   total, separate from the 100,000 shares in AOP Founders from December 23, 2008; (v) continued

6   promises that the LLC would be converted to a corporation; (vi) repeated representations that Ms.

7   Weber would be provided with stock certificates for these shares; and (vii) representations to Ms.

8   Weber in Summer 2009 that in order to obtain financing for the company from SYW, Ms. Weber

9   would have to convert her ownership to "stock options," and that unless she did so, there would be no

10   way to close the transaction and save the company. By making these false statements and

11   misrepresentations of material facts, AOP, AOP Founders, and Ms. Milone acted willfully and with the

12   deliberate intent to induce Ms. Weber to invest in AOP and AOP Founders.

13   50.   On information and belief, Alleghany and SYW knew or should have known that Ms.

14   Weber actually owned and had been promised her equity stake, but induced Ms. Milone, AOP, and

15   AOP Founders to make these false statements and misrepresentations of material facts in order to

16   secure more advantageous terms for themselves at the expense of Ms. Weber's interests.

17   51.   Alleghany also colluded with AOP, AOP Founders, and Ms. Milone to manipulate the

18   timing of Alleghany's B-round investment in AOP until after AOP had wrongfully terminated Ms.

19   Weber, in order that AOP could avoid giving Ms. Weber the opportunity to liquidate her equity, and to

20   avoid paying Ms. Weber the $300,000 AOP and Ms. Milone had agreed to pay her upon this

21   investment.

22   52.   Ms. Weber relied upon these misstatements and omissions of material fact in making

23   her decision to invest in AOP and AOP Founders, and as a result was damaged and harmed when AOP

24   and AOP Founders failed to make the promised conversion into a corporate entity, failed to issue stock

25   certificates for her promised ownership interest in this entity, and repudiated Ms. Weber's ownership

26   interest in AOP and AOP Founders limited liability companies.

27              **SECOND CLAIM FOR RELIEF - CONSTRUCTIVE FRAUD**
                    **Against Cheryl Milone**

28

53. Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-52.

54. By virtue of Ms. Milone's position as managing member of AOP and AOP Founders, and Ms. Weber's status as a co-member, the relationship between Ms. Milone and Ms. Weber was fiduciary in nature. Ms. Milone thereby owed Ms. Weber the fiduciary duties of loyalty and care, and the obligation to conduct their business in good faith and fair dealing. Because Ms. Weber's confidence in Ms. Milone's integrity caused Ms. Weber to entrust Ms. Milone with money and resources invested in AOP and AOP Founders at Ms. Milone's behest, a confidential relationship existed at all times herein mentioned between Ms. Weber and Ms. Milone.

55. Ms. Milone constructively defrauded Ms. Weber in numerous ways, including, but not limited to: (i) failing and refusing, after repeatedly promising that Ms. Weber would join AOP as a founder, officer and investor, to acknowledge and confirm Ms. Weber's ownership in AOP and AOP Founders; (ii) refusing and failing to provide an accounting to Ms. Weber of the valuation of AOP and AOP Founders or to allow Ms. Weber access to the books and records of AOP or AOP Founders; (iii) refusing and failing to properly document Ms. Weber's ownership interest in AOP and AOP Founders; (iv) inducing Ms. Weber to invest money in, and to continue working for and on behalf of AOP and AOP Founders without this documentation and without compensation for many years by representing that Ms. Weber could trust Ms. Milone, that her ownership in and position with the company was secure, and that Ms. Weber would receive value for her contributions to the company in the form of properly documented and valued stock or other equity; and (v) entering into funding agreements with SYW and Alleghany while failing to protect Ms. Weber's interests or in a manner that served the best interests of Ms. Weber, but which were, in fact, self-dealing transactions which put the interests of Ms. Milone, SYW and Allegany ahead of Ms. Weber's.

56. Ms. Weber placed confidence in and relied on Ms. Milone until Ms. Weber realized the dishonest and wrongful practices of Ms. Milone. Until that time, Ms. Weber had reasonably and actually relied on Ms. Milone's representations of honesty and integrity.

57. As a proximate result of Ms. Milone's constructive fraud, Ms. Weber has suffered damages in an amount to be proven at trial.

1      58.     In doing the acts alleged herein, Ms. Milone acted with oppression, fraud and malice,

2    and Ms. Weber is entitled to punitive damages.

3
### THIRD CLAIM FOR RELIEF - DECEIT
#### Against Article One Partners Holdings, LLC, AOP Founders, LLC,
4    #### SYW Private Investment LLC, Alleghany Capital Corp., and Cheryl Milone

5      59.     Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-58.

6      60.     Between 2007 and 2011, Ms. Milone, AOP and AOP Founders, through their managing

7    member Ms. Milone and other agents, affirmatively misrepresented the value of the ownership interest

8    in AOP and AOP Founders which Ms. Weber would obtain in exchange for capital investment and the

9    investment of her time and resources as a founder, officer, and employee of the companies, and

10    actively concealed or suppressed pertinent facts to prevent Ms. Weber from learning the truth about

11    how the form, percentage, and value of her ownership interest would be affected by the funding

12    agreements and transactions between AOP and AOP Founders, on the one hand, and other investors,

13    including SYW and Alleghany, on the other.

14      61.     As alleged above, these misrepresentations and concealments included (i) false

15    promises in Spring of 2008 by Ms. Milone that if Ms. Weber joined the company as a founder, she

16    would receive at least a 1% ownership interest in the company for her $100 purchase; (ii) written

17    statements on December 23, 2008 that Ms. Weber was granted an additional 100,000 shares in AOP

18    Founders in exchange for her work with the company; (iii) additional statements in February 2009 that

19    the company required an immediate investment of $50,000 from Ms. Weber to avoid bankruptcy; (iv)

20    statements asserting that with the value of this $50,000 investment, Ms. Weber would increase her 5%

21    interest to 5.5% interest , which would then be doubled for 11% total, separate from the 100,000 shares

22    in AOP Founders from December 23, 2008; (v) continued promises that the LLC would be converted

23    to a corporation; (vi) repeated representations that Ms. Weber would be provided with stock

24    certificates for these shares; and (vii) representing to Ms. Weber in Summer 2009 that in order to

25    obtain financing for the company from SYW, Ms. Weber would have to convert her ownership to

26    "stock options," and that unless she did so, there would be no way to close the transaction and save the

27    company.

28

1    62.    Defendants AOP, AOP Founders and Ms. Milone knew of the materiality and falsity of
2    these nondisclosures, concealments and misrepresentations. Their actions and inactions were taken
3    with intent to induce reliance thereon by Ms. Weber, benefitting Defendants at her expense.

4    63.    On information and belief, Alleghany and SYW knew or should have known that Ms.
5    Weber actually owned and had been promised her equity stake, but induced Ms. Milone, AOP, and
6    AOP Founders to make these false statements and misrepresentations of material facts in order to
7    secure more advantageous terms for themselves at the expense of Ms. Weber's interests.

8    64.    Alleghany also colluded with AOP, AOP Founders, and Ms. Milone to manipulate the
9    timing of Alleghany's B-round investment in AOP until after AOP had wrongfully terminated Ms.
10   Weber, in order that AOP could avoid giving Ms. Weber the opportunity to liquidate her equity, and to
11   avoid paying Ms. Weber the $300,000 AOP and Ms. Milone had agreed to pay her upon this
12   investment.

13   65.    Ms. Weber reasonably relied upon these nondisclosures, concealments and
14   misrepresentations and was induce to invest money in, and to continue working for and on behalf of AOP
15   and AOP Founders, without the promised documentation and without compensation for many years.

16   66.    Defendants' conduct was a substantial factor in inducing Ms. Weber to rely upon their
17   false statements, misrepresentations and concealments. Ms. Weber does not have her rightful and
18   proper ownership interest in AOP and AOP Founders, and suffered damages in an amount to be proven
19   at trial, which includes, but is not limited to, the value of this ownership interest and the amount of
20   funds and resources invested by Ms. Weber in AOP and AOP Founders, in addition to any and all
21   expenses incurred by Plaintiff in attempting to account for and recover this interest wrongfully denied
22   her.

23   67.    By their actions and conduct, Defendants are jointly and severally liable for damages
24   suffered by Ms. Weber due to Defendants' deceitful acts, in an amount to be determined at trial.

25   68.    The wrongful conduct of Defendants was egregious and carried out with willful and
26   conscious disregard of Ms. Weber's rights, and was hence oppressive and malicious. As a result, Ms.
27   Weber is entitled to punitive damages from Defendants.

28   //

1  //

2  //

3  //

4

5

### FOURTH CLAIM FOR RELIEF - NEGLIGENT MISREPRESENTATION
### Against Article One Partners Holdings, LLC, AOP Founders, LLC,
### SYW Private Investment LLC, Alleghany Capital Corp., and Cheryl Milone

6    69.    Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-68.

7    70.    Between 2007 and 2011, Ms. Milone, AOP and AOP Founders, through their managing

8  member Ms. Milone and other agents, made representations as to past or existing material facts

9  regarding the value and form of Ms. Weber's ownership interest in AOP and AOP Founders, including

10  (i) statements in February 2009 that the company required an immediate investment of $50,000 from

11  Ms. Weber to avoid bankruptcy; (ii) statements regarding the value of this $50,000 investment, to the

12  effect that Ms. Weber would double her 5.5% interest in the company, separate from the 100,000

13  shares from December 23, 2008; and (iii) statements representing to Ms. Weber in Summer 2009 that

14  in order to obtain financing for the company from SYW, Ms. Weber would have to convert her

15  ownership to "stock options," and that unless she did so, there would be no way to close the transaction

16  and save the company.

17    71.    These representations were untrue as to the value of the ownership interest Ms. Weber

18  would obtain in exchange for her $50,000 and the financial condition of the company, but regardless of

19  her actual belief, Ms. Milone made these representations without any reasonable ground for believing

20  them to be true.

21    72.    Ms. Milone made these representations at least partly at the behest of SYW because

22  SYW told Ms. Milone it would not invest in a company with so much equity owned outright by

23  executives such as Ms. Weber and Mr. Felts.

24    73.    Additionally, on information and belief, Alleghany and SYW knew or should have

25  known that Ms. Weber actually owned and had been promised her equity stake, but induced Ms.

26  Milone, AOP, and AOP Founders to make these false statements and misrepresentations of material

27  facts in order to secure more advantageous terms for themselves at the expense of Ms. Weber's

28  interests.

Computerlaw
Group LLP
computerlaw.com

Second Amended Complaint                          16                          Case No. 13-cv-7437 (ER)

1    74.    Alleghany also colluded with AOP, AOP Founders, and Ms. Milone to manipulate the

2  timing of Alleghany's B-round investment in AOP until after AOP had wrongfully terminated Ms.

3  Weber, in order that AOP could avoid giving Ms. Weber the opportunity to liquidate her equity, and to

4  avoid paying Ms. Weber the $300,000 Ms. Milone and AOP had agreed to pay her upon this

5  investment.

6    75.    These representations were made with intent to induce reliance thereon by Ms. Weber,

7  and to induce Ms. Weber to make the $50,000 investment in AOP and to sign agreements converting

8  her existing ownership into "stock options."

9    76.    Ms. Weber was unaware of the falsity of these representations, and acted in reliance

10  upon the truth of these representations and was justified in relying upon these representations.

11    77.    Ms. Weber reasonably relied upon these nondisclosures, concealments and

12  misrepresentations and was induced to invest money in, and to continue working for and on behalf of

13  AOP and AOP Founders, without the promised documentation and without compensation for many

14  years.

15    78.    As a result of her reliance upon the truth of the representations, Ms. Weber sustained

16  damages in an amount to be proven at trial, but which includes, but is not limited to, the value of this

17  ownership interest and the amount of funds and resources invested by Ms. Weber in AOP and AOP

18  Founders, in addition to any and all expenses incurred by Plaintiff in attempting to account for and

19  recover this interest wrongfully denied her.

20  **FIFTH CLAIM FOR RELIEF - BREACH OF CONTRACT**
**Against Article One Partners Holdings, LLC, AOP Founders, LLC,**
21  **SYW Private Investment LLC, Alleghany Capital Corp., and Cheryl Milone**

22    79.    Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-78.

23    80.    By 2011, Defendants Article One Partners Holdings, LLC, Article One Founders, LLC,

24  Cheryl Milone and Frances Weber, had entered into multiple binding written and oral agreements,

25  including the written August 7, 2007 Subscription Agreement, the May 20, 2008 Operating Agreement

26  of Article One Partners, LLC, the December 23, 2008 grant of 100,000 shares in Article One Founders,

27  LLC by Ms. Milone, and the Second Amended and Restated Limited Liability Agreement of June 17,

28  2010 (the "Agreements"), to grant Ms. Weber a membership interest in AOP and AOP Founders, and

1  an equivalent share of stock in the company when it converts to a corporation, in return for Ms.
2  Weber's investments of money, time and work as a founder, employee and investor of AOP and AOP
3  Founders. Ms. Weber and AOP also entered into the September 2, 2011 Heads of Agreement
4  guaranteeing Ms. Weber, among other things, the opportunity to sell a portion of her equity, and
5  payment of an additional \$300,000 upon the next investment secured by AOP.

6      81.     Ms. Weber complied with each of her requirements under the Agreements and the Heads of
7  Agreement, including capital contributions of \$50,000 and over four years of work for AOP as a founder,
8  officer, and employee.

9      82.     Ms. Weber's performance of her obligations under the Agreements and the Heads of
10  Agreement occurred in a timely manner and fulfilled her obligations under the Agreements.

11      83.     Despite Ms. Weber's performance and compliance with her obligations under the
12  Agreements and the Heads of Agreement, Defendants AOP, AOP Founders and Cheryl Milone have
13  materially breached the Agreements and the Heads of Agreement by, among other actions and omissions,
14  (i) refusing to give Ms. Weber access to the records of AOP and AOP Founders; (ii) refusing to give Ms.
15  Weber an accounting of the value of her ownership interest in AOP and AOP Founders; and (iii) refusing
16  to grant Ms. Weber an ownership in AOP and AOP Founders and repudiating Ms. Weber's rightful
17  ownership interests in AOP and AOP Founders. Further, on information and belief, Alleghany and
18  SYW knew or should have known that Ms. Weber actually owned and had been promised her equity
19  stake under the Agreements, but induced Ms. Milone, AOP, and AOP Founders to make these false
20  statements and misrepresentations of material facts in order to secure more advantageous terms for
21  themselves at the expense of Ms. Weber's interests.

22      84.     Alleghany also colluded with AOP, AOP Founders, and Ms. Milone to manipulate the
23  timing of Alleghany's B-round investment in AOP until after AOP had wrongfully terminated Ms.
24  Weber, in order that AOP could avoid giving Ms. Weber the opportunity to liquidate her equity, and to
25  avoid paying Ms. Weber the \$300,000 AOP and Ms. Milone had agreed to pay her upon this
26  investment, under the Heads of Agreement.

27      85.     AOP, AOP Founders, Cheryl Milone, Alleghany, and SYW's actions and omissions in
28  material breach of contract have harmed and damaged Ms. Weber in an amount to be proven at trial.

1  //

2  //

3  //

4  ### SIXTH CLAIM FOR RELIEF - BREACH OF FIDUCIARY DUTY
### Against Cheryl Milone

5

6  86.     Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-85.

7  87.     Defendant Milone, by virtue of her role as managing member of AOP and AOP

8  Founders, and Ms. Weber's status as co-member, owes Ms. Weber fiduciary duties of loyalty, care and
good faith.

9

10  88.     Ms. Milone breached her fiduciary duties to Ms. Weber in numerous ways, including,

11  but not limited to: (i) failing and refusing, after repeatedly promising that Ms. Weber would join AOP

12  as a founder, officer and investor, to acknowledge and confirm Ms. Weber's ownership in AOP and

13  AOP Founders; (ii) refusing and failing to provide an accounting to Ms. Weber of the valuation of

14  AOP and AOP Founders or to allow Ms. Weber access to the books and records of AOP or AOP

15  Founders; (iii) refusing and failing to properly document Ms. Weber's ownership interest in AOP and

16  AOP Founders; (iv) inducing Ms. Weber to invest money in, and to continue working for and on

17  behalf of AOP and AOP Founders without this documentation and without compensation for many

18  years by representing that Ms. Weber could trust Ms. Milone, that Ms. Weber's ownership in and

19  position with the company was secure, and that Ms. Weber would receive value for her contributions

20  to the company in the form of properly documented and valued stock or other equity; and (v) entering

21  into funding agreements with Defendants SYW Private Investment LLC and Alleghany Capital

22  Corporation while failing to protect Ms. Weber's interests, or in a manner that served the best interests

23  of Ms. Weber, but which were, in fact self-dealing transactions which put the interests of Ms. Milone,

24  SYW and Allegany ahead of Ms. Weber's.

25  89.     By intentionally committing the acts set forth in the preceding paragraph, Ms. Milone
has breached her fiduciary duties of care, loyalty, and good faith.

26

27  90.     As a proximate result of Ms. Milone's breach of her fiduciary duties of care, loyalty and

28  good faith to Ms. Weber, Ms. Weber does not have her rightful and proper ownership interest in AOP

1   and AOP Founders, and suffered damages in an amount to be proven at trial, but which includes, but is

2   not limited to, the value of the ownership interest and the amount of funds and resources invested by

3   Ms. Weber in AOP and AOP Founders, in addition to any and all expenses incurred by Plaintiff in

4   attempting to account for and recover this interest wrongfully denied her.

5        91.    Ms. Weber is also entitled to a full accounting and delivery of AOP and AOP Founders

6   tax returns and documentation which AOP was required to provide to comply with federal and state

7   securities and tax laws and regulations.

8        92.    In doing the acts alleged herein, Ms. Milone acted with oppression, fraud, and malice

9   and Ms. Weber is entitled to punitive damages in an amount as authorized by law.

10

### SEVENTH CLAIM FOR RELIEF - VIOLATIONS OF NEW YORK LABOR CODE §191(3)
### Against Article One Partners Holdings, LLC.

11

12        93.    Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-92.

13        94.    Ms. Weber was an employee of AOP from September 1, 2007 to December 31, 2011,

and as an employee, qualified for the protection of the New York Labor Law.

14

15        95.    As an employee of AOP, from September 1, 2007, Ms. Weber was entitled to

16   compensation for her services in an amount at least equal to the Federal Minimum Wage. From

17   September 1, 2007 to December 31, 2011, AOP failed to pay such compensation. Ms. Weber was also

18   entitled to a performance-based bonus, and, in the event of discharge other than for "cause" a

19   severance payment equal to three months' of salary. Ex. 1, §§2, 3, 7. Ms. Weber was employed by

20   AOP for four years, and entitled to, at minimum, $500,000 under the Employment Agreement.

21        96.    However, AOP never paid Ms. Weber any amount even approaching the $500,000 the

22   company now claims she was paid. Likewise, Defendants never employed her in a *bona fide* executive

23   or *bona fide* professional capacity when she was stripped of all management responsibility.

24   Defendants, in fact, repudiated the compensation, repudiated benefits, and repudiated the equity, and

25   other perquisites, to which she would have been entitled as an "executive vice president."

26        97.    At the time Ms. Weber's employment was terminated on December 31, 2011, at least

27   $200,000 of the $500,000 remained unpaid. AOP failed to pay this amount as required by New York

28

1  Labor Code section 191(3), which sets a statutory deadline for timely payment no later than one month
2  after her termination, according to the contractual pay period in the Employment Agreement.

3      98.    Further, after Ms. Weber was terminated on December 31, 2011, under Ms. Weber's
4  Employment Agreement with AOP, Ms. Weber was entitled to severance payment of three months of
5  her base salary. Under the Heads of Agreement, AOP agreed to allow Ms. Weber to draw down this
6  severance term in the form of a three-month paid sabbatical in the last three months of 2011. Under
7  the Heads of Agreement, Ms. Weber was entitled to this severance payment of $40,250. In violation
8  of New York Labor Code section 191(3), AOP made none of these payments as they became due in
9  October, November, and December 2011, and has not made any severance payments at all.

10      99.    AOP's failure to timely pay Ms. Weber her earned wages was willful because AOP
11  knew it owed Ms. Weber these amounts.

12      100.    Moreover, AOP's failure to timely pay these wages was also willful, in violation of
13  New York Labor code section 198, because it was knowing, deliberate and voluntary disregard of its
14  obligations under New York Labor Code. Accordingly, Ms. Weber is entitled to a statutory award of
15  attorneys' fees and costs. Ms. Weber is also entitled to a full accounting and delivery of AOP and
16  AOP Founders tax returns and documentation which AOP was required to provide to comply with
17  federal and state securities and tax and reporting laws and regulations. Despite requests for this
18  federally mandated documentation, AOP has failed to provide Ms. Weber with any documentation
19  (including K-1 Tax Statements and Company Annual Reports) since the date of her wrongful
20  termination on December 31, 2011.

21              **EIGHTH CLAIM FOR RELIEF - BREACH OF WRITTEN EMPLOYMENT CONTRACT**
                **Against Article One Partners Holdings, LLC.**
22

23      101.    Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-100.

24      102.    Ms. Weber, as an employee of AOP, entered into a written compensation agreement on
25  January 1, 2009, under which Ms. Weber would receive compensation in the form of (a) base salary;
26  (b) stock options; and (c) bonuses. *See* Ex. 5. Moreover, in the event AOP terminated Ms. Weber for
27  other than cause, Ms. Weber was entitled to severance in an amount not less than three months of her
28  then-current salary.

//

//

103.    Ms. Weber executed against the required objectives and adhered to all portions of the contract required for these wages, stock options and bonuses. Further, AOP terminated Ms. Weber unilaterally and without cause on December 31, 2011, entitling Ms. Weber to the severance payment.

104.    AOP breached this contract by not paying and refusing to pay Ms. Weber the salary, options, bonuses and severance promised and due to her.

105.    As a direct and proximate result of AOP's misconduct, Ms. Weber has been damaged in an amount to be determined, but which is believed to be in excess of $1,000,000.

### NINTH CLAIM FOR RELIEF – WRONGFUL TERMINATION IN VIOLATION OF THE FAMILY MEDICAL LEAVE ACT OF 1993, 26 U.S.C. §2601 *ET SEQ.* Against Article One Partners Holdings, LLC, AOP Founders, LLC, and Cheryl Milone

106.    Ms. Weber repeats and incorporates by reference the allegations in paragraphs 1-105.

107.    Ms. Weber is an eligible employee within the meaning of the term as used in the Family Medical Leave Act of 1993 because she accrued more than 1250 hours of service, and twelve months of consecutive service, as a paid employee of AOP prior to taking leave of absence for her own health and to serve as caregiver for her mother, who had a serious health condition.

108.    Ms. Weber is an eligible employee within the meaning of the term as used in the Family Medical Leave Act of 1993 because AOP employed 50 or more employees at her worksite at the company's office or within 75 miles of her worksite, although it attempts to avoid this and other statutory protections for its workers by misclassifying workers as independent contractors while they are in fact employees (the "Research Workers"). The Research Workers AOP misclassifies as "independent contractors" are employees because

(a) AOP controls the compensation of the Research Workers through its feedback on the documents submitted by the research workers; AOP maintains close supervisory contact with the research workers, advising them on the quality of the research submitted as well as making suggestions and requests to enhance and further develop the collection of documents sent to AOP by the Research Workers. This feedback and supervision impacts the compensation paid

1    by AOP to these Research Workers through a system of points which accumulate through long-

2    term participation as well as the monetary compensation paid for piece-work;

3    (b) AOP reserves the right to set and control the system of points and compensation at its own

4    discretion; including assessing the research performed by each Research Worker and assigning

5    each worker a "value" based on the overall quality of their research work. The assessed value

6    assigned by AOP determines the amount and level of compensation for the Research Worker;

7    (c) AOP pays compensation annually to its Research Workers based on the points accumulated;

8    (d) AOP sets the terms for how and when any work is submitted, including when projects are

9    posted and whether any extensions are granted, and the number of documents Research

10    Workers are permitted to submit;

11    (e) The researchers' work in performing the prior art searches is vital—indispensable— to AOP's

12    business; in fact, they perform the core function of AOP's business model, which is to produce

13    crowd-sourced prior art searches on the inventions in patents and patent applications;

14    (f) AOP exercises managerial control over the work performed and turned in by the researchers:

15        i.   Prior to being employed on any research project, each Research Worker must agree to

16           certain conditions and terms including, but not limited to, terms regarding confidentiality

17           and potential conflicts of interest;

18        ii.  AOP sets the number of submissions a Research Worker may submit for each project, and

19           the times within which work and submissions can occur;

20        iii.  AOP continually reviews the documents submitted by the Research Workers and

21           periodically sends the Research Workers guidance on potential research avenues

22           including specific follow-up questions and directions, and suggestions for improving

23           research submissions;

24        iv.  AOP communicates both indirectly through newsletters as well as directly by email with

25           research questions, directions and follow-up suggestions;

26        v.   AOP maintains records of all submissions by each research worker and uses those records

27           to determine and control amounts and levels of compensation for future work projects

28           ("AOP Researcher Work Records");

vi.   AOP uses the AOP Researcher Work Records to set the conditions and limitations on how each Research Worker works on each research project.

vii.   AOP uses the AOP Researcher Work Records to permit and restrict research worker participation, and retains the right to prohibit specific persons from participating in their research projects; and

viii.   upon information and belief, AOP offers certain guaranteed payment work to an AOP-selected category of Research Workers;

(g)  the company actively promoted the fact that AOP has numerous Research Workers who worked exclusively or predominately through AOP and whose sole annual compensation is earned through AOP; and

(h) On information and belief, AOP guarantees payment to a selected sub-category of Research Workers.

109.   Ms. Weber is an eligible employee within the meaning of the term as used in the Family Medical Leave Act of 1993 because she was not among the top 10% of employees in terms of compensation during her time working at AOP.

110.   AOP wrongfully demoted and then terminated Ms. Weber, citing her leave of absence as a reason for doing so, first stripping her of her title and responsibilities which she held prior to her leave of absence, reducing her compensation and benefits, and then, ultimately firing her.

111.   This demotion and termination was in direct violation of the protections of the Family Medical Leave Act.

112.   Ms. Weber suffered damages including loss of benefits and other compensation, loss of position and the prerequisites and prestige within the company connected with that position; she suffered further damages attendant on her loss of income, including the ability to provide for her parents and herself, and to meet her financial obligations.  These damages continue to accrue.

113.   Moreover, AOP's actions were willful, in violation of Family Medical Leave Act, because they were knowing, deliberate and voluntary disregard of its obligations under the Family Medical Leave Act.  Accordingly, Ms. Weber is entitled to punitive damages and an award of statutory award of attorneys' fees and costs, as allowed by the Family Medical Leave Act.

1  obligations, and to avoid complying with a qualified employer's obligations under the Family Medical
2  Leave Act.

3                                   **PRAYER FOR RELIEF**

4      Ms. Weber prays for judgment on these claims for relief as follows:

5      A.    On the First, Second, Third, Fourth, Fifth, Sixth, Eighth, and Ninth Claims, for damages

6            in an amount to be proven at trial, but in an amount believed to be not less than

7            $1,000,000;

8      B.    On the Second, Third, Sixth, and Ninth Claims, for punitive and exemplary damages;

9      C.    On the Sixth and Seventh Claims, for an accounting, including tax reporting and return

10 documentation relating to the AOP and AOP Founders limited liability companies and Ms. Weber's

11 earnings, enabling a determination of her rights and interests as an investor and owner in AOP and

12 AOP Founders;

13     D.    On the Seventh and Ninth Claims, for attorneys' fees;

14     E.    On all Claims, for costs of suit and prejudgment interest on all damages awarded;

15     F.    For such other and further relief as is found proper.

16

17                                               Respectfully submitted,

18 Dated: February 13, 2014                      COMPUTERLAW GROUP, LLP

19                                        By:    Joeh Russo
20                                               Jack Russo, Esq.

21                                               Attorney for Plaintiff
                                                 FRANCES WEBER
22

23

24

25

26

27

28

# EXHIBIT 1

*Frances Weber*

## I.   INDIVIDUAL INVESTORS

*(Investors other than Individuals should turn to Page 3)*

1.   Personal.

Name   *FRANCES H. Weber*

(Exact name as it should appear in the Company's records)

Residence Address   *191 Catherine St., S.I., NY 10302*
Home Telephone   *718-816-6232*
Date of Birth   *03-03-1954*
Social Security Number   ▮▮▮▮▮▮
Employer   *Article One Partners*
Business Address   *488 Madison Ave, 19th Fl., NY NY 10022*
Business Telephone   *347-838-0618*
Occupation   *Vice President - Research*
Citizenship   *US*

2.   Joint Ownership.

If investment will be held jointly, circle one:  joint tenant, tenant in common, community property holder.

Complete the following for any additional investor ONLY if the information differs from that given above:

Residence Address _____
Home Telephone _____
Date of Birth _____
Social Security Number _____
Employer _____
Business Address _____
Business Telephone _____
Occupation _____
Citizenship _____

3.   Accredited Investor Status.

I am an "Accredited Investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act by virtue of meeting the standard(s) that I have **initialed** below:

(Please initial, in the space provided, the statements(s) applicable to you.)

_____   a.   I have, or my spouse and I jointly have, a net worth (*i.e.,* total assets in excess of liabilities) equal to or in excess of $1,000,000.

or

_____   b.   I have had an individual annual income (exclusive of my spouse's income, regardless of whether this is a joint investment with my spouse) in excess of $200,000 ("Individual Income Standard"), or joint annual income with my spouse in excess of $300,000 ("Joint Income Standard"), in each of the two most recent years and reasonably expect to exceed the relevant Income Standard this year.

If neither of these statements are applicable to you, please initial here ___*FHW*___.

*If you are an individual investor, please turn to Page 5 of this Subscription Agreement.*

422275.2                                2

000084

## II.   NON-INDIVIDUAL INVESTORS

*(Answer Part II only if the purchase is proposed to be made by a corporation, partnership, trust or other entity.)*

*If investment will be made by more than one affiliated entity,*
*please complete a copy of this entire Subscription Agreement for each entity.*

1.   Identification.

Name _____
(Exact name as it will appear in the Company's records)

Address of Principal Place of Business _____

Jurisdiction of Formation Or Incorporation: _____

Contact Person _____

Telephone Number _____

Federal Employer Identification No. _____

Type of Entity (**initial** only one):

_____   Limited Partnership

_____   General Partnership

_____   Corporation

_____   Revocable Trust (in Attachment A, identify each grantor, and indicate under which circumstances the trust is revocable by the grantor)[1]

_____   Other Type of Trust (indicate type of trust and, for trusts other than pension trusts, name the grantors and beneficiaries in Attachment A)

_____   Other form of organization (indicate form of organization): _____

Was the entity formed for the purpose of this investment (please **initial**)?

        Yes _____                    No _____

If the answer is yes, all shareholders, partners or other equity owners must answer Part I of this Subscription Agreement.  If the above answer is no, please continue completing this form.

2.   Business.

Please **initial** where appropriate to indicate which of the following categories are applicable to you:

_____   Any organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, corporation, Massachusetts or similar business trust or partnership, not formed for the specific purposes of acquiring securities of the Company, with total assets in excess of $5,000,000;

_____   a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

_____   a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958;

_____   an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that act;

*continued on next page →*

---

[1]   Each individual who invests through a revocable trust must complete the Individual Investor section of this Investor Questionnaire and Subscription Agreement.

000085

_____ a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution defined in Section 3(a)(5)(A) of the Securities Act, acting in either an individual or fiduciary capacity;

_____ an insurance company as defined in Section 2(13) of the Securities Act;

_____ an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974 whose investment decision is made by a fiduciary which is either a bank, savings and loan association, insurance company, or registered investment advisor, or whose total assets exceed $5,000,000, or, if a self-directed plan, a plan whose investment decisions are made solely by persons who are accredited investors;

_____ an entity in which all of the equity owners are accredited investors;

_____ Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered by the Company, whose purchase is directed by a sophisticated person (as described in Rule 506(b)(2)(ii) promulgated under the Securities Act).

_____ Other. Describe: _____

_____

_____

000086

## III.   INVESTOR REPRESENTATIONS

THE INVESTOR, BY SIGNING THIS SUBSCRIPTION AGREEMENT, WILL BE DEEMED TO HAVE MADE ALL
REPRESENTATIONS AND WARRANTIES CONTAINED IN PARAGRAPHS 1 THROUGH 15 BELOW.

1. The Investor acknowledges that the Investor has received a copy of the Company's Amended
and Restated Limited Liability Company Agreement, the form of which is attached hereto as
Exhibit "A" (as attached and as hereafter executed by all parties, the "LLC Agreement").

2. The Interests were not offered for sale to the Investor by means of any form of general or public
solicitation or advertisement including but not limited to any publicly disseminated
advertisement or sales literature, through the mails, or otherwise; through any advertisement,
article, notice, or other communication published in any newspaper, magazine, website, or other
similar media, or broadcast over television, radio or e-mail; or through any seminar or meeting
whose attendees were invited by any such general solicitation or general advertising.

3. Any certificate or certificates, operating agreements, or any other indicia of ownership
representing or evidencing the Interests shall contain a legend as follows:

THE INTERESTS EVIDENCED BY THIS CERTIFICATE ARE SUBJECT TO AND TRANSFERABLE ONLY IN
ACCORDANCE WITH THAT CERTAIN AMENDED AND RESTATED LLC AGREEMENT, AS MAY BE
AMENDED FROM TIME TO TIME, OF ARTICLE ONE PARTNERS, LLC, A COPY OF WHICH IS ON FILE
AT THE PRINCIPAL OFFICE OF THE COMPANY.  NO TRANSFER OR PLEDGE OF THE INTERESTS
EVIDENCED HEREBY MAY BE MADE EXCEPT IN ACCORDANCE WITH AND SUBJECT TO THE
PROVISIONS OF SAID LLC AGREEMENT.  BY ACCEPTANCE OF THIS CERTIFICATE, ANY HOLDER,
TRANSFEREE OR PLEDGEE HEREOF AGREES TO BE BOUND BY ALL OF THE PROVISIONS OF SAID LLC
AGREEMENT.

INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED BY THE HOLDER FOR
INVESTMENT PURPOSES ONLY AND NOT FOR RESALE, TRANSFER OR DISTRIBUTION, HAVE BEEN
ISSUED PURSUANT TO EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF FEDERAL
SECURITIES LAWS AND CERTAIN STATE LAWS, AND MAY NOT BE OFFERED FOR SALE, SOLD OR
TRANSFERRED OTHER THAN PURSUANT TO EFFECTIVE REGISTRATION UNDER SUCH LAWS, OR IN
TRANSACTIONS OTHERWISE IN COMPLIANCE WITH SUCH LAWS, AND UPON EVIDENCE REASONABLY
REQUESTED BY THE COMPANY SHOWING COMPLIANCE WITH SUCH LAWS.

4. The Investor acknowledges that: (a) the Investor has been provided with information
concerning the Company and has had an opportunity to ask questions and to obtain such
additional information concerning the Company as the Investor deems necessary in connection
with the Investor's acquisition of the Interests; (b) information with respect to existing business
and historical operating results of the Company and estimates and projections as to future
operations involve significant subjective judgment and analysis, which may or may not be
correct; (c) the Company cannot, and does not, make any representation or warranty as to the
accuracy of the information concerning the past or future results of the Company.

5. The Investor has sought such accounting, legal and tax advice as the Investor considered
necessary to make an informed investment decision.  The Investor is experienced in investment
and business matters and is aware of and can afford the risks of making such an investment,
including the risk of losing the Investor's entire investment.

6.    The Interests to be acquired by the Investor will be acquired solely by and for the account of the Investor for investment and are not being purchased for resale or distribution.  The Investor has no contract, undertaking, agreement or arrangement with any person to sell, transfer or pledge to such person or anyone else any of the Interests (or any portion thereof or interest therein) which the Investor will acquire and the Investor has no present plans or intentions to enter into any such contract, undertaking, agreement or arrangement.  The financial condition of the Investor is such that the Investor has no need for liquidity with respect to the Investor's investment in the Interests and no need to dispose of any portion of the Interests to satisfy any existing or contemplated undertaking or indebtedness; and the overall commitment by the Investor to investments which are not readily marketable is not disproportionate to the Investor's net worth and will not become excessive as a result of investment in the Interests.

7.    The Investor understands that the Company has no obligation or intention to register the Interests under any U.S. federal or state securities act or law or the securities act or law of any other jurisdiction.

8.    The Investor understands, represents, warrants and agrees that, except as described in the LLC Agreement, the Investor's Interests are not transferable, that the Investor will not, directly or indirectly, sell, assign, convey, hypothecate or otherwise transfer the Investor's Interests (or any portion thereof or interest therein) except in accordance with the terms of such agreements and that violation of the foregoing will cause such transfer to be void and need not be recognized by the Company.

9.    The Investor warrants that the Investor has knowledge and experience in financial, investment and business matters and that the Investor is capable of evaluating the merits and risks of an investment in the Interests.

10.   The Investor has relied solely upon the LLC Agreement and independent investigations made by the Investor in making the decision to purchase the Interests.

11.   The Investor expressly acknowledges that:

(a)   No federal, state or other governmental agency has passed upon the adequacy or accuracy of any information concerning the Company or made any finding or determination as to the fairness of the investment, or any recommendation or endorsement of the Interests as an investment.

(b)   The Investor is not dependent upon a current cash return with respect to the Investor's investment in the Interests and the Investor understands that distributions are not required to be made and that returns on an investment in the Interests may not be realized for years, if ever.

12.   The Company's obligation to sell and convey the Interests to the Investor will be subject to the Investor becoming a party to the LLC Agreement, and will be subject to the performance by the Investor of all its agreements hereunder to be performed on or prior to the closing, including but not limited to the obligation of the Investor to make its full capital contribution to the Company in accordance with the LLC Agreement and execute any other needful and necessary documents required by Company.  A consent to becoming a Member under the LLC Agreement is attached hereto as Attachment B.

000088

13.   The Investor (i) if an individual, is at least 21 years of age; (ii) if a partnership, is comprised of partners all of whom are at least 21 years of age; and (iii) if a corporation, partnership, trust or other like entity, is authorized and otherwise duly qualified to purchase and hold the Interests. The Investor has duly authorized, executed and delivered this Subscription Agreement and understands that the Company is not obligated to accept this Subscription Agreement and that this Subscription shall be valid and binding on the Company only upon acceptance by the Company.

14.   If Investor is married and Investor's spouse has not signed this Subscription Agreement as an Additional Investor, Investor has delivered to the Company a copy of the consent attached hereto as <u>Attachment C</u> signed by such spouse.

15.   The Investor represents that the information contained herein is complete and accurate and may be relied upon by the Company in complying with its obligations under applicable securities laws.

## IV.   COMPANY REPRESENTATIONS

THE COMPANY, BY SIGNING THIS SUBSCRIPTION AGREEMENT, WILL BE DEEMED TO HAVE MADE THOSE REPRESENTATIONS AND WARRANTIES CONTAINED IN PARAGRAPHS 1 THROUGH 2 BELOW TO THE UNDERSIGNED INVESTOR.

1.   <u>Organization, Standing and Qualification</u>.  The Company (i) is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware, (ii) has the requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as and in the places such properties are owned, leased or operated and where such business is conducted, (iii) is duly qualified and authorized to do business, and is in good standing as a foreign limited liability company in each jurisdiction in which it owns or leases property or in which the nature of its business requires it to be so qualified, except where the failure to be so qualified or authorized or have such standing would not have a material adverse effect on its conduct of its business or on its respective properties, assets, liabilities, condition (financial or otherwise), or results of operations, taken as a whole.

2.   <u>Authority</u>.  The Company has all requisite limited liability company power and authority to enter into this Subscription Agreement and each other agreement, document and instrument to be executed or delivered by it in connection with this Subscription Agreement (collectively, the "Transaction Documents") and to carry out the transactions contemplated hereby and thereby. This Subscription Agreement constitutes, and, when executed and delivered, each other Transaction Document to be executed and delivered by the Company will constitute, the legal, valid and binding obligation of the Company, subject to the effects of bankruptcy, fraudulent conveyance, moratorium or other similar laws relating to or affecting creditor's rights generally, and general equitable principles (whether considered in a proceeding in equity or at law).  All limited liability company proceedings and member action required to be taken by the Company relating to the execution, delivery and performance of this Subscription Agreement and the Transaction Documents and the consummation of the transactions contemplated hereby and thereby have been duly taken.

*[signatures appear on following page]*

000089

IN WITNESS WHEREOF, the undersigned have executed this Subscription Agreement as of this _7th_ day of _August_, 200_9_.

**Individual Investor (and any Additional Investor):**

_Frances H Weber_

Print Name: _FRANCES H WEBER_

_(Investors sign on applicable line at right)_ ↗ ↘

Print Name: _____

**Non-Individual Investor:**

[_____]

_(Print Entity Name in Space Above)_

By: _____

Print Name:

Print Title:

**SUBSCRIPTION AMOUNT:**

| Initial Percentage Interest (%) | Contribution Percentage (%) | Maximum Capital Contribution |
|---|---|---|
| ___% | ___% | $ _50,000_ |
| (subject to dilution) (to be completed by Company) | (to be completed by Company) | (to be completed by Investor) |

ARTICLE ONE PARTNERS, LLC

By: _____

Name:

Title:

000090

Attachment A

I.   REVOCABLE TRUSTS

    1.     Identify each grantor:

    2.     Circumstances under which the trust is revocable by the grantor(s).

II.  OTHER TRUSTS

    1.     Type of trust:

    2.     For trusts other than pension trusts, identify each grantor and beneficiary:

        Grantor(s):

        Beneficiary(ies):

*422275.2*

9

Attachment B

**ARTICLE ONE PARTNERS, LLC**
**LLC AGREEMENT**
**CONSENT CERTIFICATE**
**************************************************************

This certifies that the undersigned Investor has received a copy of and has had the opportunity to review a copy of the Limited Liability Company Agreement of Article One Partners, LLC (the "Company") in the form attached hereto as Exhibit "A" (the "LLC Agreement").

The undersigned Investor accepts, approves, ratifies, and confirms all of the terms, conditions, and covenants of the LLC Agreement, which are incorporated by reference. The undersigned Investor shall possess and be entitled to rights of ownership of membership interests in the Company only as provided in the LLC Agreement.

This consent may be executed in multiple counterparts, which shall be taken together and deemed to constitute one and the same instrument.

Date: _August 7, 2009_____

***Individual Investor (and any Additional Investor):***

_Frances H Weber_____
Print Name:  FRANCES H WEBER

*(Investors sign on*          ↗
*applicable line at right)*  ↘

Print Name: _____

***Non-Individual Investor:***

[_____]
*(Print Entity Name in Space Above)*

By: _____
    Print Name:
    Print Title:

*(All investors to complete)* →

***All Investors:***

Address: _191 Catherine St_____
          _S.I., NY  10022_____

SS# or TIN: [████████████]
Tel.: _718-816-6232_____

000092

Exhibit "A"

[Attached]

*422275.2*

11

Attachment C

**ARTICLE ONE PARTNERS, LLC**
**SPOUSAL CONSENT**
*************************************************************

IRREVOCABLE PROXY

In accordance with the Subscription Agreement dated as of _____, 2008, between Article One Partners, LLC, a Delaware limited liability company (the "Company") and _____, my legal spouse (the "Investor"), I hereby constitute and appoint the Investor to act as my true and lawful proxy and attorney-in-fact, in my name and on my behalf, with full power of substitution, to vote all of the membership interest in the Company that I may at any time come to own for any reason, at any meeting of members of the Company or any adjournment or adjournments thereof, or to give consent with respect to the membership interest upon any and all such matters as each such proxy or his or her substitute in his or her sole discretion deems proper.

All power and authority hereby conferred is coupled with an interest and is irrevocable.

Dated as of _____.

*Spouse of Investor*:

_____
Print Name:

000094

# EXHIBIT 2

THE SECURITIES REPRESENTED BY THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 NOR REGISTERED NOR QUALIFIED UNDER ANY STATE SECURITIES LAWS.  SUCH SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, DELIVERED AFTER SALE, TRANSFERRED, PLEDGED, OR HYPOTHECATED UNLESS QUALIFIED AND REGISTERED UNDER APPLICABLE STATE AND FEDERAL SECURITIES LAWS OR UNLESS, IN THE OPINION OF COUNSEL REASONABLY SATISFACTORY TO THE COMPANY, SUCH QUALIFICATION AND REGISTRATION IS NOT REQUIRED.  ANY TRANSFER OF THE SECURITIES REPRESENTED BY THIS AGREEMENT IS FURTHER SUBJECT TO OTHER RESTRICTIONS, TERMS AND CONDITIONS WHICH ARE SET FORTH HEREIN.

## AMENDED AND RESTATED

## LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ARTICLE ONE PARTNERS, LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT (this "Agreement") of Article One Partners, LLC (the "Company"), dated as of May __, 2008, is made by and among the persons listed on Schedule A hereto, as the same may be amended from time to time in accordance with the terms of this Agreement, as the members (the "Members").

W I T N E S S E T H:

WHEREAS, the name of the Company upon its formation on October 4, 2007 was Patent Profit, LLC, and upon the filing of a Certificate of Amendment on April 30, 2008, the Company's name was changed to Article One Partners, LLC;

WHEREAS, AOP Founders LLC, the original member of the Company (the "Original Member"), has heretofore entered into that certain Limited Liability Company Agreement of Article One Partners, LLC (the "Original Agreement");

WHEREAS, the Company holds certain intellectual property assets, including without limitation certain patent applications and trademark applications;

WHEREAS, the Original Member and the other parties hereto who are becoming Members of the Company as of the date hereof wish to amend and restate the Original Agreement by entering into this Amended and Restated Limited Liability Company Agreement;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Definitions.  For purposes of this Agreement:

The term "Act" means the Delaware Limited Liability Company Act, as the same may be amended from time to time.

The term "affiliate" means with reference to any person, any partner, officer, director, shareholder, trustee, employee or agent of such person or any person directly or indirectly controlling, controlled by or under common control with such person, or any person who is a member of the family of any such partner, officer, director, shareholder, trustee, employee or agent, or a trustee or beneficiary of any trust for the benefit of any such person or any such partner, officer, director, shareholder, employee or agent or any such family member.

The term "Certificate" means the Certificate of Formation of the Company, filed under the Act, as the same may be amended or restated from time to time.

The term "Majority in Interest" is defined in Section 6(g) hereof.

The term "Managing Member" is defined in Section 7 hereof.

The term "Membership Interest" means a Member's aggregate rights in the Company, including, without limitation, the Member's right to share(s) of various categories of Net Income and Net Loss (as such terms are hereinafter defined), the right to receive distributions from the Company and the right to vote, grant consents and participate in the management of the Company with respect to certain matters, all as provided herein.

The term "Percentage Interest" with respect to any Member shall mean the percentage set forth on Schedule A hereto opposite the name of such Member under the column "Percentage Interest", as the same may be amended from time to time in accordance with the terms and conditions of this Agreement.

The term "person" means any association, corporation, estate, general partnership, limited partnership, limited liability company, joint venture, natural person, real estate investment trust, business or other trust, custodian, or nominee, or any individual or other entity in its own or any representative capacity.

2.     Formation; Effect of Agreement.

(a)     The Company was formed on October 4, 2007 upon the filing of the Company's Certificate in accordance with the Act.

(b)     It is the express intention of the Members that this Agreement shall be the sole source of agreement of the parties with respect to the subject matter hereof, and, except to the extent a provision of this Agreement is expressly prohibited or ineffective under the Act, this Agreement shall govern, even when inconsistent with, or different from, the provisions of the Act.  To the extent any provision of this Agreement is prohibited or ineffective under the Act, this Agreement shall be considered amended to the smallest degree possible in order to make it effective under the Act.

3.     Name.  The name of the Company shall be Article One Partners, LLC.  The business of the Company may be conducted, upon compliance with all applicable laws, under any other name designated by the Managing Member.

4.     Principal Office; Registered Agent; Qualification.

(a)     The principal office of the Company shall be at 123 E. 75th St., Suite 15AB, New York, NY 10021 or such other place as shall be determined by the Managing Member.

(b)     The registered agent of the Company for service of process in the State of Delaware and the registered office of the Company in the State of Delaware shall be that person and location reflected in the Company's Certificate.  The Managing Member may, from time to time, change the registered agent or registered office through appropriate filings with the Secretary of State of the State of Delaware.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Managing Member shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be.

(c)     The Managing Member is authorized to qualify the Company to do business in such jurisdictions as it may determine from time to time, and in furtherance thereof, the Managing Member may qualify the Company using the Company's name or an assumed name to be determined by the Managing Member, as may be required by law.

5.     Purposes; Powers.  The purposes of the Company are (a) to engage in intellectual property investment strategies, including without limitation patent valuation, (b) to conduct any other lawful business or activity whatsoever, as permitted by applicable law and as determined from time to time by the Managing Member, and (c) to do any and all other acts and things which may be necessary, appropriate or incidental to the carrying out of such purposes; including but not limited to the power:

(i)     to conduct its business, carry on its operations and have and exercise the powers granted to a limited liability company by the Act in any jurisdiction that

may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

        (ii)     to acquire by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purpose of the Company;

        (iii)    to enter into, perform and carry out contracts of any kind, including, without limitation, contracts with any Member or any affiliate thereof, or any agent of the Company necessary to, in connection with, convenient to or incidental to the accomplishment of the purposes of the Company;

        (iv)    to purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships (including, without limitation, the power to be admitted as a partner thereof and to exercise the rights and perform the duties created thereby), trusts, limited liability companies (including, without limitation, the power to be admitted as a member or appointed as a manager thereof and to exercise the rights and perform the duties created thereby), or individuals or direct or indirect obligations of the United States or of any government, state, territory, governmental district or municipality or of any instrumentality of any of them;

        (v)     to lend money and/or advance credit, either with or without security, for any purpose, to invest and reinvest its funds, and to take and hold real and personal property, assets, rights and interests for the payment of funds so loaned or invested;

        (vi)    to invest in, contribute to the capital of and/or form or acquire direct or indirect subsidiaries and/or other businesses and entities, whether partnerships, limited liability companies, corporations or other persons or entities;

        (vii)   to sue and be sued, complain and defend, and participate in administrative or other proceedings, in its name;

        (viii)  to appoint employees and agents of the Company, and define their duties and fix their compensation;

        (ix)    to adopt equity appreciation, phantom equity and/or similar compensatory plans for the Company's employees, consultants and other persons;

        (x)     to indemnify any person in accordance with the Act and to obtain any and all types of insurance;

        (xi)    to cease its activities and cancel its Certificate;

(xii)   to negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, acknowledge or take any other action with respect to any lease, contract or other agreement or commitment in respect of or in connection with any of the assets, rights, properties, interests, business and/or operations of the Company;

(xiii)   to borrow money, incur credit related obligations and/or indebtedness and issue evidences of indebtedness and other obligations, to guaranty indebtedness, liabilities and obligations of others, whether direct or indirect subsidiaries, affiliates, Members or others, and to secure any or all of the foregoing by one or more mortgages, pledges, security interests or other liens on, of or in the assets, rights and interests of the Company, and to enter into and perform, and to modify, amend, restate, refinance and restructure, credit, loan, guaranty, security, pledge and other agreements, notes and instruments;

(xiv)   to repay in whole or in part, refinance, modify or extend any indebtedness, liability or obligations, and/or any mortgage, lien, pledge or security interest affecting any of the assets, properties, rights or interests, of the Company and, in connection therewith, to execute, deliver and perform any or all refinancings, modifications, extensions, renewals, or restructuring thereof;

(xv)   to pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any and all other claims or demands of or against the Company or to hold any proceeds and/or other sums or assets against the payment of contingent liabilities;

(xvi)   to merge with, or consolidate into, another Delaware limited liability company or other business entity as permitted by the Act, upon the approval of the Managing Member;

(xvii)   to maintain for the conduct of the Company's affairs one or more offices and in connection therewith rent or acquire office space, and do such other acts as the Managing Member may deem necessary or advisable in connection with the maintenance and administration of the Company;

(xviii)   to engage personnel, whether part-time or full-time, and attorneys, accountants and such other persons as the Managing Member may deem necessary or advisable; and

(xix)   to do such other acts as the Managing Member may deem necessary or advisable in connection with the maintenance and administration of the Company.

The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purposes set forth in this Section 5 and all other powers conferred by or permitted under the Act.

6.    <u>Meetings of Members</u>.

(a)    There shall be no requirement that the Company hold annual or other meetings of Members; provided, however that, subject to Section 6(h) hereof, meetings of Members shall be held to approve all acts, if any, which, pursuant to the Act or this Agreement, expressly require the approval of the Members.

(b)    Except as expressly required by the Act or by this Agreement, no vote, consent or authorization of the Members shall be required for, and the Members shall not be entitled to vote on, the taking of any action on behalf of or with respect to the Company or its affairs, and no Member shall have the authority to bind, or shall enter into any agreement or transaction or take any action in the name and/or by or on behalf of the Company or otherwise carry on the business or affairs of the Company.

(c)    Meetings of the Members may be called by the Managing Member or a Majority in Interest of all Members and shall be held at such place as shall be designated from time to time by the Managing Member. Except as otherwise provided by the Act or this Agreement, the holders of a Majority in Interest of all Members, present in person or represented by proxy, shall constitute a quorum for the transaction of any business at such meeting. When a quorum is once present to organize a meeting of Members, it is not broken by the subsequent withdrawal of any one or more Members. The holders of a Majority in Interest of those Members present in person or represented by proxy at any meeting of Members, including an adjourned meeting, whether or not a quorum is present, may adjourn such meeting to another time and place.

(d)    Written notice (which need not state the purpose or purposes for which the meeting is called) of any meeting of the Members, stating the place, date and hour of the meeting, shall be mailed or given in person by or at the direction of the Member calling such meeting, to each Member entitled to vote at the meeting at least two (2) business days prior to the meeting; provided, however, that any Member may waive in writing any such notice; and further, provided, that attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except when the Member attends the meeting for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not lawfully called or convened.

(e)    At any meeting of the Members, every Member entitled to vote may vote or attend in person or by proxy.

(f)    For each one percentage point (or fraction thereof) of a Member's Percentage Interest from time to time, such Member shall be entitled to one vote (or a corresponding fractional vote).

(g)    Except as otherwise provided in this Agreement, all Company action required to be approved by vote of the Members shall be authorized if those Members whose then Percentage Interests constitute, singly or in the aggregate, a majority of the aggregate Percentage Interests at such time (a "<u>Majority in Interest</u>") of all the Members affirmatively vote in favor of or consent to said authorization. Except as provided in Section 6(h) hereof,

in every instance where this Agreement requires the consent or authorization of Members or of any particular group of Members, such consent or authorization need not be in writing.

(h)     Notwithstanding anything herein to the contrary, any action required or permitted to be taken by the Members may be taken without a meeting, if a Majority in Interest of all Members (or such other applicable percentage in interest of Members as required by the terms of this Agreement with respect to such action) consent in writing to such action.  Such consent shall have the same effect as a vote of the Members.

(i)     Members may participate in a meeting of the Members by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear one another and such participation shall constitute presence in person at such meeting.

7.     <u>Managing Member</u>.

(a)     Except as otherwise provided in this Agreement, (i) the management of the Company shall be vested exclusively in the Managing Member, or such other Members as may from time to time hereafter be designated by the Managing Member, and (ii) except as otherwise contemplated in clause (i) above, no other person shall take part in the management, control or operation of, transact any business for, or act for, bind or otherwise obligate, the Company.  The Managing Member of the Company shall be AOP Founders LLC, or such other Member as may be designated by a Majority in Interest of the Members. The Managing Member shall, except as provided in this Agreement, have the exclusive power and authority to authorize and cause to be taken any action, in the name of and/or by or on behalf of the Company, of any kind and to authorize and cause to be done anything and everything, in the name of and/or by or on behalf of the Company, which the Managing Member shall deem necessary or appropriate to carry on the purposes of the Company.

(b)     Except as otherwise provided in this Agreement, the Managing Member shall have all of the rights, powers and obligations of a manager as provided in the Act and as otherwise provided by law.

(c)     During the continuance of the Company, the Managing Member shall devote only such time and effort to the Company as he, she or it may determine from time to time as appropriate in his or her or its reasonable discretion.  Nothing contained in this Section 7 or elsewhere in this Agreement shall preclude the Managing Member or any affiliate thereof from receiving any compensation from the Company or any affiliate thereof for services rendered thereto.

(d)     No Member shall enter into any agreement or transaction or take any action in the name and/or by or on behalf of the Company or otherwise carry on the business or affairs of the Company without the consent or authorization of a Majority in Interest of all Members unless such Member is also the Managing Member.

(e) The Managing Member shall be an authorized agent of the Company for the purpose of the Company's business, and all authorized actions of the Managing Member shall bind the Company.

(f) Persons dealing with the Company are entitled to rely conclusively upon the power and authority of the Managing Member, and upon the certificate of the Managing Member to the effect that such Managing Member is then acting as manager of the Company with authority to act by and/or in the name or on behalf of the Company.

(g) Except as otherwise stated, references in this Agreement to one or more Members shall be deemed to include the Managing Member.

8. <u>Officers</u>.

(a) The Managing Member may designate one or more persons, including, without limitation, the Managing Member himself, herself or itself, any of the Managing Member's affiliates, or any other Members or their affiliates, from time to time to act as authorized officers or agents of the Company, and to execute, deliver and perform agreements, instruments and documents in the name and on behalf of the Company (each such person, an "<u>Officer</u>"), consistent with and subject to the powers and authority of the Managing Member.

(b) From time to time the Managing Member, may establish, increase, reduce or otherwise modify responsibilities of the Officers of the Company or may create or eliminate offices as appropriate.

(c) Each Officer appointed by the Managing Member shall serve until his or her successor is duly elected as provided herein or, if earlier, until his or her death, resignation or removal. A vacancy in any office because of death, resignation, removal or any other cause shall, if desired by the Managing Member, be filled for the unexpired portion of the term in the manner prescribed in this Agreement for the regular appointment to such office.

(d) Any Officer may resign at any time by so notifying the Managing Member in writing. Such resignation shall take effect upon receipt of such notice or at such later time as is therein specified, and unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. The appointment of an individual as an Officer shall not of itself create a right to any employment with the Company. The Managing Member may remove any Officer, at any time, with or without cause.

9. <u>Actions Requiring the Consent of the Members</u>. Without the prior written consent of a Majority in Interest of all Members, the Company shall not:

(a) dissolve or liquidate; or

(b) sell, transfer or otherwise dispose of any substantial part of the assets or business of the Company or merge or consolidate the Company with any other person.

10.     Reimbursement of Certain Expenses. The Company shall promptly reimburse the Managing Member for the organizational and other expenses of the Company which have been or may be advanced by the Managing Member from time to time.

11.     No Liability.

(a)     No Member shall be personally liable for the return or payment of all or any portion of the capital of or profits allocable to or loans to the Company by any Member (or any successor, assignee or transferee thereof), it being expressly agreed that any such return of capital or payment of profits made pursuant to this Agreement, or any payment or repayment in respect of any such loan, shall be made solely from the assets of the Company (which shall not include any right of contribution from any Member).

(b)     Neither the organizer of the Company nor any Member shall have any liability for any obligations or liabilities of the Company except if and then only to the extent expressly provided in the Act.

(c)     No Managing Member or Officer shall have any personal liability to the Company or any of the Members for damages for any breach of duty as a Managing Member or as an Officer, as the case may be, and/or when acting with the consent of the Managing Member, provided, however, that the foregoing provision shall not eliminate or limit the liability of any Managing Member or Officer if a judgment or other final adjudication adverse to such person establishes that acts or omissions of such person were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated.

12.     Indemnification.

(a)     The Company shall indemnify, defend and hold harmless the authorized person set forth in Section 2(a), each Member and any officer, director, member, manager or controlling person of each Member, and the Managing Member and/or each Officer, and any of such Managing Member's or Officer's agents, members, managers, controlling persons, employees, advisors and consultants, from and against any and all loss, liability, damage, cost or expense, including reasonable attorneys' fees, suffered or incurred in defense of any demands, claims or lawsuits against any such person, in or as a result of or relating to such person's capacity, actions or omissions as an organizer, Member, Managing Member and/or Officer of the Company or as an officer, director or controlling person of such Member, or as an agent, member, manager, controlling person, employee, advisor or consultant, as the case may be, or concerning the Company or any activities undertaken on behalf of the Company, provided that a court of competent jurisdiction upon entry of a final judgment does not find (i) that the relevant acts or omissions of such person were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated, or (ii) that the relevant acts or omissions of such person have violated such a lesser standard of conduct or public policy as under applicable law prevents indemnification hereunder.

(b)     Any indemnifiable person referred to in this Section 12 shall be entitled to receive, upon request therefor, to the extent not prohibited under the Act or other applicable law, advances to cover the costs of defending any claim or action against such person; provided, however, that such advances shall be repaid to the Company if such person is found by a court of competent jurisdiction upon entry of a final judgment to have violated the standards for indemnification set forth in Section 12(a). All rights to indemnification and advances shall continue as to any person who has ceased to be a Member, Managing Member, Officer or other person indemnified hereunder and shall inure to the benefit of the executors, administrators, legatees and distributees of such person.

13.     Other Activities; Transactions with Affiliates.   Nothing contained in this Agreement shall preclude the Managing Member or any affiliate thereof from acting as a principal, partner, member, shareholder, employee or agent of or investor in any corporation, partnership, limited liability company or other entity or person, or from receiving any compensation or participating in any profits in connection with any of the foregoing, or from making investments or engaging in ventures, activities or businesses for his, her or its own account or for the account of others, including investments, ventures, activities and/or businesses which are the same as or different from or directly in competition with those made, held or engaged in by the Company; and neither the Company nor any other Member shall have any right to participate in any manner in any profits or income earned or derived by the Managing Member or affiliate thereof, from or in connection with any such investment, venture, activity or business.  Without limiting the generality of the foregoing, nothing contained in this Agreement shall preclude the Managing Member, or any affiliate thereof, from directly or indirectly benefitting from or seizing or taking advantage of any business or other opportunity or investment which is consistent with the purpose or activities of, or could conceivably be viewed as an opportunity available to or capable of being exploited by, the Company.

14.     Capital Contributions; Net Income and Net Loss; Distributions.

(a)     Definitions.

(i)     The "Contribution Percentage" of a particular Member, shall mean the percentage set forth opposite such Member's name on Schedule A hereto.

(ii)     The term "Available Cash Flow" shall mean, with respect to any period, all cash received by the Company from all sources (other than Capital Contributions) during such period, less the portion thereof to be used to pay (or to establish reserves for) Company working capital needs, expenses and fees, employee salaries and benefits, principal and interest on Company debt, investments, acquisitions, and contingencies, all as determined by the Managing Member.

(iii)     The "Capital Contributions" of a Member shall be the sum of the amount of money which such Member contributes to the capital of the Company as provided in this Section 14.

(iv)     The term "Code" shall mean the Internal Revenue Code of 1986, as amended.

(v)     A "Company Year" shall mean the fiscal year of the Company for federal income tax purposes.

(vi)     "Net Income" or "Net Loss" for any Company Year shall mean the net income or loss of the Company for such year, determined in accordance with Code Section 703(a), increased by any income exempt from federal income tax and decreased by any expenditure of the Company described in Code Section 705(a)(2)(B), or treated as such pursuant to Regulations Section 1.704-1(b)(2)(iv)(i).  Without limiting the generality of the foregoing, Net Income and Net Loss shall reflect any gains or losses realized by the Company on the sale, exchange or other disposition of Company assets and all deductible Company expenses including, without limitation, (A) any deduction or amortization of expenses incurred in connection with the formation and organization of the Company, (B) any taxes imposed on the Company, (C) interest payable by the Company, and (D) general operating expenses of the Company.  Net Income and Net Loss shall be determined net of items of Company gross income, gain, loss, or deduction specially allocated pursuant to Section 14(f) hereof.

(vii)     The term "Regulations" means the United States Treasury Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time.

(b)     Percentage Interest and Capital Contributions.  The respective Percentage Interests of the Members in the Company shall be as set forth in Schedule A hereto, unless and until such percentage shall be changed by the Managing Member upon the admission of new Members as provided in Article 17 herein or as otherwise provided herein.

(c)     Capital Accounts.

(i)     A separate capital account ("Capital Account") shall be established and maintained for each Member in accordance with the substantial economic effect and special rule provisions of Regulations Sections 1.704-1(b)(2) and 1.704-2. The Members' respective Capital Accounts shall be kept separate and apart from the books in which the Company maintains records of the Company's adjusted tax basis in its assets and the Members' adjusted tax bases in their Membership Interests.  Each Member's Capital Account shall be (i) increased by the amount of such Member's Capital Contributions (if any) and any Net Income and items of Company gross income and gain allocated to such Member pursuant to this Section 14, and (ii) reduced by the amount of all distributions made to such Member in respect of his, her or its interest in the Company, whether pursuant to this Section 14 or otherwise, and any Net Loss and items of Company gross deduction and loss allocated to such Member pursuant to this Section 14.  In addition, the Members' Capital Accounts are to be adjusted in accordance with Section 14(c)(ii) hereof, if applicable. Allocations under Section 14(c)(iv) hereof shall affect the Members' Capital Accounts only to the extent provided in such Section.

(ii)    The assets of the Company shall be revalued on the books of the Company to equal their fair market values in accordance with Regulations Section 1.704-1(b)(2)(iv)(f) at the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis contribution to the capital of the Company; (B) the distribution by the Company to a Member of more than a de minimis amount of Company assets other than money as consideration for an interest in the Company; and (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), provided that adjustments pursuant to clauses (A) and (B) above shall be made only if deemed necessary by the Managing Member.  Upon a revaluation of the Company's assets pursuant to this Section 14(c)(ii), each Member's Capital Account shall be increased or decreased as if such assets were sold for their fair market values (determined as provided in Section 14(h) hereof) and the gain or loss realized thereon were allocated among the Members in accordance with this Section 14 and Regulations Section 1.704-1(b)(2)(iv)(f).

(iii)    When property is reflected in the Capital Accounts at a book basis different from the basis of such property for federal income tax purposes, all Net Income, Net Loss and items of Company gross income, gain, deduction and loss with respect to such property shall be determined for purposes of adjusting Capital Accounts based on the book basis of such property in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

(iv)    For federal income tax purposes, all gain, loss, depreciation or amortization with respect to property which is reflected in the Capital Accounts at a basis different from the tax basis of such property shall be allocated among the Members in a manner that takes into account such difference in accordance with the principles of Code Section 704(c) and Regulations Section 1.704-3.  Allocations pursuant to the previous sentence are solely for federal, state and local income tax purposes and shall not affect or in any way be taken into account in computing a Member's Capital Account or share of distributions pursuant to any provision of this Agreement.  Similarly, items of tax credit and tax credit recapture shall be allocated to the Members in accordance with Regulations Section 1.704-1(b)(4)(ii), but shall not be credited or charged to their respective Capital Accounts except to the extent required under Regulations Section 1.704-1(b)(2)(iv)(j).

(d)    Allocations of Net Income and Net Loss.

(i)    Subject to Section 14(f) hereof, Net Income and Net Loss for each Company Year shall be allocated to the Members as follows:

(A)    Allocations of Net Income.  Net Income for each Company Year shall be allocated as follows:

(1)    First, to the Members in the ratio and to the extent of the excess of the aggregate Net Loss theretofore allocated to each Member over the aggregate Net Income theretofore allocated to such Member pursuant to this Section 14(d)(i)(A)(1).

(2) Second, to the Members in the ratio and to the extent of the excess of the aggregate distributions theretofore made by the Company to each Member pursuant to Section 14(e) over the aggregate Net Income theretofore allocated to such Member pursuant to this Section 14(d)(i)(A)(2).

(3) Thereafter, to the Members in accordance with their Percentage Interests.

(B) <u>Allocations of Net Loss</u>.  Net Loss for each Company Year shall be allocated as follows:

(1) First, to the Members in the ratio and to the extent of the positive balances in their respective Capital Accounts.

(2) Thereafter, to the Members in accordance with their Percentage Interests.

(C) <u>Limitation on Net Loss Allocations</u>.

(1) Notwithstanding any provisions of this Section 14 to the contrary, and in accordance with Section 1.704-1(b)(2)(ii)(d) of the Regulations, no Member shall be allocated Net Loss to the extent such allocation would cause or increase a deficit balance in such Member's Capital Account in excess of such Member's then Permissible Capital Account Deficit (as defined in Section 14(f)(i)(C) hereof).  Solely for purposes of the limitation in the previous sentence, the Members' Capital Accounts shall be deemed reduced by the reasonably expected adjustments, allocations and distributions described in paragraphs (4), (5) and (6) of Regulations Section 1.704-1(b)(2)(ii)(d).  Allocations of Net Loss that would be made to a Member but for such limitation shall be made to the other Members to the extent not inconsistent with such limitation.

(2) Notwithstanding anything to the contrary in Section 14(d)(i) hereof, Net Income and Net Loss (and items of gross income, gain, loss and deduction, if necessary), realized by the Company in connection with the winding up and liquidation of the Company pursuant to Section 15(c) hereof and for each Company Year for which the time·prescribed by law for filing federal income tax returns of the Company shall not have expired as of such time, including gain or loss realized by the Company upon the sale (or deemed sale) of its property or assets, shall be allocated, to the extent possible and subject to the regulatory allocations of Section 14(f) hereof, in a manner so as to cause the positive Capital Account balance of each Member to equal the amount due such Member in accordance with the provisions of Section 15(c)(iv) hereof.

(e) <u>Distributions</u>.  Distributions of Available Cash Flow (other than any such distributions made in connection with the liquidation of the Company pursuant to Section 15 hereof) shall be made to the Members in accordance with their Percentage Interests at such times as the Managing Member may determine.  For purposes of this Agreement, any distributions and adjustments made on or before January 15th of a calendar

year shall be treated as a distribution or adjustment relating to the immediately preceding calendar year. Accordingly, new Members admitted to the Company on or after January 1st of such year shall not participate in any such distribution, but shall participate in all future distributions while they continue to be Members.

        (f)    <u>Regulatory Allocations and Related Matters</u>.

        (i)    The following allocations shall be made in accordance with and to the extent required by Regulations Sections 1.704-2(f), 1.704-2(i), and 1.704-1(b)(2)(ii)(d). References in this paragraph (f) to "partner" and "partnership" are intended to relate to the characterization of the Members and the Company, respectively, for federal income tax purposes.

        (A)    If there is a net decrease in partnership minimum gain during a Company Year (determined in accordance with Regulations Section 1.704-2(d)), items of Company gross income and gain shall be allocated to the Members as quickly as possible in the amounts and manner described in Section 1.704-2(f) of the Regulations. This subparagraph (f)(i)(A) is intended to comply with the minimum gain chargeback requirement relating to any nonrecourse liability of the Company set forth in Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

        (B)    If there is a net decrease in partner nonrecourse debt minimum gain during a Company Year (determined in accordance with Regulation Section 1.704-2(i)(3)), items of Company gross income and gain shall be allocated as quickly as possible to those Members who had a share of such partner nonrecourse debt minimum gain at the end of the preceding Company Year (determined in accordance with Regulation Section 1.704-2(i)(5)) in the amounts and manner described in Regulation Section 1.704-2(i)(4). This subparagraph (f)(i)(B) is intended to comply with the minimum gain chargeback requirement relating to nonrecourse debt set forth in Regulation Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

        (C)    If a Member unexpectedly receives an adjustment, allocation or distribution described in Section 1.704-1(b)(2)(ii)(d) of the Regulations which creates or increases a deficit balance in such Member's Capital Account in excess of the sum (with respect to each Member, such Member's "<u>Permissible Capital Account Deficit</u>") of (A) such Member's share of the partnership minimum gain (as determined at the end of such Company Year in accordance with Regulation Section 1.704-2(g)), (B) such Member's share of the partner nonrecourse debt minimum gain (as determined at the end of such Company Year in accordance with Regulation Section 1.704-2(i)(3)), and (C) such Member's deficit Capital Account restoration obligation under this Agreement, if any, then items of Company gross income and gain shall be allocated to such Member as quickly as possible to eliminate such excess, as required by Regulation Section 1.704-1(b)(2)(ii)(d), provided that an allocation pursuant to this subparagraph (f)(i)(C) shall be made only if and to the extent such excess would exist after all other allocations provided for in this Section 14 have been tentatively made for such Company Year as if this subparagraph (f)(i)(C) were not in this Agreement. This subparagraph (f)(i)(C) is intended to comply with the qualified income

offset requirement set forth in Regulation Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(D)     Notwithstanding anything in this Agreement to the contrary, all items of Company gross deduction and loss attributable to a partner nonrecourse debt (as defined in Regulations Section 1.704-2(b)(4)) shall be allocated to the Member or Members that bear the economic risk of loss for such partner nonrecourse debt in accordance with Regulations Section 1.704-2(i)(1).

(ii)     The allocations required by Sections 14(d)(i)(C) and 14(f)(i)(C) hereof (the "QIO Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent permissible under the Regulations, all QIO Allocations shall be offset either with other QIO Allocations or with special allocations of other items of Company gross income, gain, loss or deduction pursuant to this Section 14(f)(ii).  Therefore, notwithstanding any other provision of this Section 14 (other than Section 14(f)(i)), the Managing Member shall make such offsetting special allocations of Company gross income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the QIO Allocations were not part of this Agreement and all Company items were otherwise allocated pursuant to Section 14(d) of this Agreement.

(iii)     Items of Company gross income, gain, loss, or deduction specially allocated pursuant to this paragraph (f) shall not be taken into account in determining Net Income and Net Loss.

(iv)     The provisions of this Agreement may be amended and the manner in which tax items are allocated may be modified to the extent the Managing Member in its sole discretion deems necessary or advisable to comply with Regulations Sections 1.704-1(b) and 1.704-2; provided, however, that any such amendment shall be made only if it is not likely to have a material effect on the amounts distributable to any Member pursuant to Section 15 of the Agreement upon the liquidation of the Company.

(g)     Determination by Managing Member of Certain Matters.  All matters concerning the determination and allocation among the Members of the amounts to be determined and allocated pursuant to this Section 14, including the taxes thereon and accounting procedures applicable thereto, shall be determined by the Managing Member, in all cases unless expressly otherwise provided for by the provisions of this Agreement.  All such determinations and allocations shall be final and binding on all the Members.

(h)     Fair Market Value Determinations.  For purposes of determining any appreciation in the value of any assets to be distributed in kind pursuant to this Agreement, and for purposes of allocating such assets among the Members in the case of any distribution, such assets shall be valued at the fair market value thereof as of the most recent practicable date prior to such distribution by the Managing Member in its reasonable judgment.

(i)     Tax Matters Partner.  The Managing Member shall be the "tax matters partner" for purposes of Subchapter C of Chapter 63 of Subtitle F of the Code.  If he, she or it should hereafter be unable or unwilling to serve, his, her or its immediate and subsequent successors shall be designated by a Majority in Interest of all Members.

(j)     Withdrawals by Members.  Except as set forth herein with respect to distributions, no Member shall have the right to withdraw any funds or other assets from the Company or his, her or its Capital Account without the prior consent of the Managing Member.

15.    Dissolution.

(a)    Grounds.  Except if and to the extent otherwise required by applicable law, the Company shall be dissolved and its affairs shall be wound up solely upon the written consent of the Managing Member and a Majority in Interest of all Members.

(b)    No Right of Withdrawal or to Cause Dissolution.  No Member shall have the right to retire, resign or withdraw as a Member or otherwise cause, voluntarily or involuntarily, a dissolution of the Company other than as expressly permitted pursuant to Section 15(a) hereof, or in connection with a transfer permitted pursuant to Section 16 hereof, and any such action or any such dissolution caused by a Member, other than as so permitted, shall constitute a breach by such Member of his, her or its obligations under this Agreement.  Notwithstanding any provision of the Act to the contrary, no Member shall be entitled to any payment or distribution upon any such action or upon ceasing to be a member of the Company for any reason, except as may be expressly provided to the contrary in this Agreement.

(c)    Liquidation.  Upon dissolution of the Company, the Managing Member shall (x) within a reasonable time cause the Company's assets to be liquidated in an orderly and business-like manner so as not to involve undue sacrifice, and (y) take the following actions and make the following distributions out of the assets of the Company in the following manner and order:

(i)     first, pay or establish adequate reserves for all debts and liabilities of the Company to persons other than Members and expenses of liquidation in the order of priority provided by law;

(ii)    then, establish any reserves which the Managing Member deems necessary to provide for contingent liabilities or obligations of the Company; provided, however, that, at the expiration of such period of time as the Managing Member deems advisable, the balance of any reserves shall be paid or distributed as provided in subparagraphs (iii) and (iv) of this Section 15(c) (in the order of priority thereof), it being agreed that such reserves may, at the election of the Managing Member, be paid over to an independent institutional escrow agent chosen by the Managing Member to be held by such escrow agent as escrowee for the purpose of disbursing such reserves in payment of any of the aforesaid contingencies;

(iii)    then, pay out of the balance of such assets, if any, the outstanding balance of all remaining debts and liabilities of the Company to the Members to whom the same are owed, *pro rata*; and

(iv)    then, after giving effect to all allocations provided in Section 14 hereof, including those required under paragraph (c)(ii) thereof, pay the balance, if any, of such assets to the Members in accordance with their Percentage Interests.

Except as otherwise expressly provided herein, upon such distribution, no Member shall have any rights or claims against the Company or any other Member, notwithstanding any imbalance in the respective Capital Accounts of the Members.

(d)    Distribution in Kind. Notwithstanding the provisions of Section 15(c) hereof, if, upon dissolution of the Company, the Managing Member shall determine that the sale of part or all of the Company's assets would cause undue loss to the Members, the Managing Member may, in order to avoid such losses, either:

(i)    defer the liquidation of, and withhold from distribution for a reasonable time, any assets of the Company, except those necessary to satisfy debts and liabilities of the Company (other than those to Members); or

(ii)    distribute to the Members, in lieu of cash, interests in any Company assets and liquidate only such assets as are necessary in order to pay the debts and liabilities of the Company.

If distributions are made in kind, the Managing Member shall determine the fair market value of the property to be distributed in accordance with Section 14(h) hereof and adjustments to Capital Accounts shall be made as provided in the last sentence of Section 14(c)(ii) hereof to reflect any appreciation or depreciation in the value of such property not previously reflected in the Capital Accounts. The Capital Account of any Member receiving a distribution in kind from the Company shall be reduced by the fair market value (as so determined) of the property distributed.

(e)    Certain Obligations. No Member shall be required to pay to the Company or to any other Member or person any deficit in such Member's Capital Account upon "liquidation" (as such term is defined in Regulations Section 1.704-1(b)(2)(ii)(g)) of his, her or its interest in the Company or upon dissolution of the Company or otherwise.

(f)    No Right to Partition. The Members, on behalf of themselves and their heirs, personal representatives, successors and assigns, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for partition of the Company, or any interest which is considered to be Company assets, regardless of the manner in which title to any such assets may be held.

16.     Restrictions on Transfer.

(a)     In General.  Except as expressly provided in this Agreement, a Member shall not have the right to sell, assign, pledge, transfer, encumber or otherwise dispose of (each, a "Transfer") all or any part of his, her or its Membership Interest, unless the Managing Member shall consent to such Transfer in writing.  Any purported Transfer not so consented to shall be null and void *ab initio* and of no force or effect.

(b)     Admission of Approved Transferee.  An approved permitted transferee of a Membership Interest, and any additional Member approved for admission pursuant to Section 17 hereof, shall not be admitted as a Member pursuant to this Agreement and shall not be entitled to exercise any rights or powers of a Member unless and until such transferee executes and delivers an agreement, in form reasonably satisfactory to the Managing Member, to be a party to and to be bound by the provisions of this Agreement and acknowledging the restriction on transfers contained herein and agreeing to be bound thereby.  Whenever a Membership Interest is transferred or a new Member is admitted, the Managing Member shall concurrently therewith circulate to all the Members an amended Schedule A reflecting each such change and such amended Schedule A shall henceforth replace and supersede the Schedule A attached hereto as previously amended from time to time.

(c)     Rights of Approved Transferee.  An approved transferee who becomes a Member shall succeed and shall be subject to the rights, powers, preferences and limitations of Members under this Agreement, and shall be subject to the restrictions on and obligations of his, her or its respective transferor Member, except as may otherwise be expressly provided in this Agreement.

(d)     Sale of the Company.  If a third party wishes to engage in a Control Transaction with the Company or its Members, and a Majority in Interest of the Members wishes to consummate such Control Transaction, then all the other Members (the "Other Members") must "come along," that is, if requested by such Majority in Interest of the Members, agree to sell their Membership Interests to such third party on the same terms and conditions as agreed by the Majority in Interest of the Members, provided that the purchase price is a *bona fide*, arm's length fair market price and the other Members will receive the portion thereof attributable to their Membership Interests upon the consummation of such Control Transaction based on a hypothetical distribution pursuant to Section 14(e) hereof of such aggregate purchase price. As used in this Section 16, a "Control Transaction" shall mean (A) a merger, reorganization or similar type of transaction that either (i) results in the transfer of 50% or more of the outstanding voting membership interests in the Company or (ii) results in the Members holding a majority of the outstanding voting membership interests in the Company immediately prior to such transaction holding, directly or indirectly, less than a majority of the outstanding voting securities of the surviving entity, or (B) a sale of all or substantially all of its assets of the Company.  The Majority in Interest of the Members shall give notice (a "Bring-Along Notice") to each Member of the proposed Control Transaction, including all material terms thereof, the identity of the purchaser and the proposed closing date thereof, and each Member shall tender his Membership Interest to

such purchaser on such closing date.  Each Other Member shall deliver appropriate documentation reflecting the assignment of that portion of its Membership Interest set forth in such Bring-Along Notice and shall take all other necessary or desirable actions in connection with the consummation of such Control Transaction as requested by the Managing Member.  Each Other Member shall be responsible for his or her or its proportionate share of the liabilities and obligations (including liabilities and obligations for indemnification) only on a several basis based on such Member's percentage of ownership in the Membership Interests included in the sale.  Each Member hereby constitutes and appoints the Managing Memher to act as his, her or its true and lawful proxy and attorney-in-fact, in his, her or its name and on his, her or its behalf, with full power of substitution, and to take all actions necessary to effect such sale, including (without limitation) voting such Member's Membership Interests at any meeting of Members or giving consent with respect to the Membership Interest, as the Managing Member in his or her sole discretion deems proper.

17.    Admission of Additional Members.  Except as set forth in Section 16 hereof, no additional Members shall be admitted to the Company without the prior written consent of the Managing Member and a Majority in Interest of the other Members.

18.    Accounting and Reports to and Inspection by Members.

(a)    Annual Financial Statements.  The Company shall provide to each of the Members annual financial statements, including a balance sheet and profit and loss statement, in each case to the extent prepared by the Company.

(b)    Books and Records.  Appropriate accounts shall be kept at all times by the Company and shall be open to inspection by the Members during normal business hours.  The books of account shall be examined and/or reviewed as of the close of each fiscal year and at any other time, and in such manner, as the Managing Member may deem necessary or desirable by such firm of accountants as shall be designated by the Managing Member.  Such books of account shall be maintained in accordance with generally accepted accounting principles.

(c)    Tax Returns and Elections.  The Company shall prepare, or cause to be prepared, all necessary federal, state and local income tax returns and reports required of the Company.  The Managing Member, in his, her or its sole discretion, may, but shall not be required to, exercise or revoke any or all of the elections available to the Company under the Code, including, without limitation, any election under Section 754 of the Code to adjust the basis of the Company's assets.  The Managing Memher may elect to make any other election permitted under any provision of the Code if, in the opinion of the Managing Member, such election would be advantageous to the Members as a group or to any Member without being disadvantageous to any other Member.  Each of the Members shall supply to the Company the information necessary properly to give effect to any such election.

(d)    Reports to Members.  After the close of each fiscal year of the Company, the Company shall cause to be prepared and furnished to each Member an annual report containing a tax statement showing the items of income, deduction, gain, loss or credit

allocated to such Member pursuant to the provisions of the Code in sufficient detail to enable such Member to prepare his, her or its own income tax returns in accordance with the laws, rules and regulations thereunder then prevailing and a statement of such Member's Capital Account as of the close of such fiscal year.

(e)   Determinations Binding.  Any determination made by the Managing Member with respect to accounting matters shall be final and binding upon the other Members and their respective legal representatives.

19.   Fiscal Year.  The fiscal year of the Company shall be the calendar year or such other period as shall be determined by the Managing Member.

20.   Conversion to Corporation.  At such time and in such manner as the Managing Member shall determine to be appropriate, the Managing Member shall be entitled to cause the Company to be converted into and reconstituted as a corporation under the laws of the State of Delaware (the "Corporation"), whether by merger, transfer and/or contribution of assets and liabilities of the Company to the Corporation in exchange for shares of capital stock of the Corporation (and distribution of such shares to the Members in liquidation of the Company) or otherwise (a "Conversion", and the actual date of such Conversion being referred to herein as the "Conversion Date").  As of the Conversion Date, each Member shall, to the extent hereinafter provided, be entitled to receive a capital share ownership interest in the Corporation substantially equivalent, as reasonably determined by the Managing Member, to the Membership Interest as of the Conversion Date.  Each of the Members hereby agrees to cooperate fully with such Conversion and enter into one or more stockholders' agreements which shall reflect each of their respective rights and obligations as stockholders of the Corporation, which rights and obligations shall be substantially equivalent to the respective rights and obligations of the Members under this Agreement, and with such changes taking account of the differences between the Company and the Corporation and the laws governing the same, as the Members shall reasonably determine.

21.   Amendments.  Except as otherwise provided in this Section 21, this Agreement may not be amended except by a writing executed by a Majority in Interest of the Members.

(i)   The Managing Member may amend this Agreement without the consent of any other Member to reflect changes validly made in the membership of the Company and corresponding changes in the terms and provisions of this Agreement necessary to reflect or conform with any such change in membership, to reflect changes permitted in accordance with this Agreement in the Capital Accounts and/or Percentage Interests of the Members, to clarify any ambiguities herein or to appropriately adjust any mechanics or procedures set forth herein so long as the rights of the Members are not prejudiced thereby in any manner which is not pro rata among all the Members, or if such amendment is of an inconsequential nature (as reasonably determined by the Managing Member) and does not affect the rights of the Members in any adverse respect.

(ii)     Anything in the foregoing provisions of this Section 21 to the contrary notwithstanding, this Agreement shall be amended from time to time (without any required consent of the Members) in each and every manner deemed necessary or appropriate by the Members to comply with the then existing requirements of the Code and the Regulations and the Rulings of the Treasury Department or Internal Revenue Service affecting the Company.

22.     <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes and cancels all previous agreements, letters, negotiations, commitments and representations in respect thereof among them, and no party shall be bound by any conditions, definitions, warranties or representations with respect to the subject matter of this Agreement except as set forth herein.

23.     <u>Specific Performance</u>.  The parties hereto agree that money damages or other remedy at law would not be sufficient or adequate remedy for any breach or violation of, or a default under, this Agreement by them and that, in addition to all other remedies available to them, each of them shall be entitled to an injunction restraining such breach, violation or default or threatened breach, violation or default and to any other equitable relief, including without limitation specific performance, without bond or other security being required.

24.     <u>Notices</u>. All notices to the Company shall be addressed to its principal mailing address as established from time to time by the Managing Member.  All notices addressed to a Member shall be addressed to such Member at the address of such Member reflected in <u>Schedule A</u> attached hereto or as hereafter reflected in the books and records of the Company. Any Member may designate a new address by notice to such effect given to the Company.  Unless otherwise specifically provided in this Agreement, notices shall be in written form and a notice shall be deemed to have been effectively given on receipt if delivered by hand, on the third business day after the same shall have been mailed by certified or registered mail, return receipt requested, postage and fees prepaid, or on the first business day after the same shall have been deposited with a reputable overnight courier service.

25.     <u>Gender and Number</u>.  Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine, the feminine and the neuter.

26.     <u>Benefits of Agreement</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns; provided that nothing contained herein shall permit any assignment of any Membership Interests or any rights or obligations under this Agreement except as elsewhere permitted in this Agreement.  This Agreement shall not inure to the benefit of or be enforceable by any creditor of the Company or of any Member, or be deemed to create or be for the benefit of any person not a party hereto other than and then only for the benefit of the persons referred to in the first sentence of this Section 26.

27.    <u>Waivers</u>. No waiver by any party hereto of any failure by any other party hereto to comply with any obligation under this Agreement shall be effective unless in writing and signed by the party granting such waiver, and no such waiver shall be deemed a waiver of any subsequent failure of the same or similar nature.

28.    <u>Severability</u>. If any provision of this Agreement would be held to be invalid, prohibited or unenforceable in any jurisdiction for any reason, such provision, as to such jurisdiction only, shall be ineffective to the extent of such invalidity, prohibition, unenforceability, without invalidating the remaining provisions of this Agreement, and the validity, legality and enforceability of such remaining provisions shall not be affected in any way thereby.

29.    <u>Headings</u>. The headings and subheadings of Sections of this Agreement and/or any Schedule hereto are for convenience of reference only and shall not constitute part of or define or limit any of the provisions of this Agreement or such Schedule.

30.    <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the parties in separate counterparts, each of which, when executed, shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Any such counterpart signature page may be attached to the body of a copy of this Agreement to form a complete, integrated whole. Delivery of an executed signature page by facsimile transmission or scanned electronic file shall be effective as delivery of a manually signed counterpart of this Agreement.

31.    <u>Governing Law; Arbitration.</u>

(a)    This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to contrary choice of law principles of such State.

(b)    Except as otherwise mutually agreed to in writing by the parties thereto, any claim, dispute or controversy of whatever nature arising out of or relating to this Agreement, including, without limitation, any action or claim based on tort, contract or statute (including any claims of breach or violation of statutory or common law protections from discrimination, harassment and hostile working environment), or concerning the interpretation, effect, termination, validity, performance and/or breach of this Agreement ("<u>Claim</u>"), shall be resolved by final and binding arbitration before a panel of three (3) arbitrators (the "<u>Arbitrators</u>") selected from and administered by the American Arbitration Association. (the "<u>Administrator</u>") in accordance with the laws of the State of Delaware and the Administrator's current Commercial Arbitration Rules. Unless the parties otherwise agree, the Arbitrators shall be appointed by the Administrator from its National Roster pursuant to Rule R-11 of the Administrator's Commercial Arbitration Rules. The arbitration shall be held in the Borough of Manhattan, the City of New York.

(c)    Discovery shall be permitted as permitted under Rule 21 of the American Arbitration Association's Commercial Arbitration Rules.

(d)     The Arbitrators shall, within fifteen (15) calendar days after the conclusion of the Arbitration hearing, issue a written award and statement of decision describing the essential findings and conclusions on which the award is based.  The Arbitrators shall be authorized to award compensatory damages, but shall not be authorized (i) to award non-economic damages, such as for emotional distress, pain and suffering or loss of consortium, (ii) to award punitive damages, or (iii) to reform, modify or materially change this Agreement or any other agreements contemplated hereunder.  The Arbitrators also shall be authorized to grant any temporary, preliminary or permanent equitable remedy or relief he or she deems just and equitable and within the scope of this Agreement, including, without limitation, an injunction or order for specific performance.

(e)     Each party shall bear its own attorney's fees, costs, and disbursements arising out of the arbitration, and shall pay an equal share of the fees and costs of the Administrator and the Arbitrators.  Absent the filing of an application to correct or vacate the arbitration award under Title 10 of the Delaware Code Sections 5713 through 5717, each party shall fully perform and satisfy the arbitration award within fifteen (15) days of the service of the award.  Each party agrees to and does hereby submit to the jurisdiction and venue of, any state or federal court located in the Borough of Manhattan, the City of New York for purposes of enforcing any arbitration award.

(f)     By agreeing to this binding arbitration provision, the parties understand that they are waiving certain rights and protections which may otherwise be available if a Claim between the parties were determined by litigation in court, including, without limitation, the right to seek or obtain certain types of damages precluded by this Section 31, the right to a jury trial, certain rights of appeal, and a right to invoke formal rules of procedure and evidence.

(g)     The parties hereto agree that any arbitration commenced pursuant to this provision shall be and remain confidential, and the parties hereto shall not make any public statements concerning any arbitration, except to the extent that disclosure of or any statement concerning any arbitration is, in the opinion of counsel for one of the parties, required by applicable law.

*[balance of page intentionally left blank; signature page follows]*

## SCHEDULE A

| Members | Percentage Interest (%) | Initial Capital Contribution |
|---|---|---|
| AOP Founders LLC | 97.0% | $ 9,700.00 |
| Bret Quigley | 2.0% | 200.00 |
| Frances Weber | 1.0% | 100.00 |
| **TOTAL** | 100.0% | $10,000.00 |

# EXHIBIT 3



--- On **Tue, 12/23/08, Cheryl <_cmilone@articleonepartners.com_> wrote:**

From: Cheryl <cmilone@articleonepartners.com>
Subject: Merry Christmas!!
To: "Pao 1 Weber Fran 248" <fheweber@yahoo.com>
Date: Tuesday, December 23, 2008, 11:36 AM


Your Christmas present is 100,000 shares in the equity appreciation program. This doesn't impact my commitment to you in mid-2009. I wanted to acknowledge the effort and commitment you have, and my hope that we as a team can shoot this to the stars!!

I wish I could have made you something, and I plan to (something fun work related, light hearted), but this is really the best I can give.

I have run out of time to send the paperwork now, will follow=up with it later today.

# EXHIBIT 8

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

```
-----------------------------------------------------x
                                                     :
FRANCES WEBER,                                       :
                                                     :
                Claimant,                            :
                                                     :        Case No.  13 194 00649 12
        and                                          :
                                                     :
ARTICLE ONE PARTNERS, LLC, et al,                    :
                                                     :
                Respondents.                         :
                                                     :
                                                     :
-----------------------------------------------------x
```

**RULINGS ON PENDING MOTIONS**

The parties have made various motions pursuant to the schedule set out in Procedural Order No. 1, dated August 24, 2012.  After full consideration of the arguments presented in the papers and after due deliberation and discussion, the Arbitration Panel rules as follows:

Claimant's Motion for Administration of Case Under AAA's Employment Rules:

This motion is DENIED.  The Arbitration Agreement that establishes the jurisdiction of this Panel to hear and determine this dispute states that it "shall be resolved by final and binding arbitration . . .  in accordance with the (AAA's) current Commercial Arbitration Rules."  As a matter of well-established arbitration law, whether state or Federal, this Panel is authorized to act only in accordance with the agreement the parties set forth in the Arbitration Agreement in their contract, here the LLC Agreement.  The Panel has no authority to substitute other rules that fewer than all parties want to adopt after the fact for reasons of equity, convenience or any other consideration.

Respondents' request for an award of attorneys fees incurred in response to the motion is DENIED, for the reasons stated in the penultimate paragraph below.

Respondents' Motion to Dismiss Claims for Lack of Jurisdiction to Arbitrate
(denominated Respondents' Objections to the "Arbitrability" of Certain Claims):

The Motion to dismiss the First and Second Claims is DENIED.   These claims arise out of, relate to, and are part and parcel of the relationships created by the LLC agreement and are covered by the broad Arbitration Agreement which states that "any claim, dispute or controversy of whatever nature arising out of or relating to this Agreement or or its interpretation, effect, termination, validity, performance and/or breach . . . shall be resolved by fi  al and binding arbitration . . . . "

The Motion to dismiss the Fourth Claim is GRANTED.  This claim is for wrongful termination of an employment agreement.  That employment agreement does not contain an agreement to arbitrate disputes that might arise thereunder. To the contrary, it specific lly directs the parties to the courts to resolve such disputes:  "Any dispute shall be resolved within the courts located in the State of New York".  The parties themselves made a clear and dispositive choice to resolve disputes under the employment agreement in court and not in arbitration.

The Motion to dismiss the Third and Fifth Claims against Respondents other than AOP is DENIED.  These parties are party to the LLC Agreement, which contains the Arbitration Agreement under which this Panel is authorized to act, and "any claim, dispute or controversy of whatever nature arising out of or relating to this Agreement or its interpretation, effect, termination, validity, performance and/or breach . . ." is arbitrable.  Whether such claims against the non-AOP Respondents have any substance or merit is not the subject of the pending motion.

The motion to dismiss claims for attorneys' fees, costs and punitive/exemplary damages is GRANTED.  The Arbitration Agreement specific lly excludes such items from the scope of the authority of the arbitrators to grant or award.  The AAA's Commercial Arbitration Rules do not create powers to include provisions in an award that the parties themselves have by their express agreement excluded.

Respondents request that the discovery schedule in  Procedure Order No 1 be suspended so as to have limited discovery concerning whether Claimant executed the arbitration agreement, followed by a hearing regarding that issue.  The request is DENIED.  To suspend discovery would totally disrupt the entire schedule in Procedure Order No. 1.  Rather than change the schedule, the parties are strongly encouraged to conduct their discovery in such a manner as to permit this issue, if it is a real one, to be addressed by motion as soon as feasible.

**Dated: September 21, 2012**


                                        James E. Daniels
                                        Judith Levin
                                        Barbara A. Mentz

                                        **THE ARBITRATION PANEL**

# EXHIBIT 9

# COMPUTERLAW GROUP LLP

ATTORNEYS AT LAW
401 FLORENCE STREET
PALO ALTO, CALIFORNIA 94301
COMPUTERLAW.COM

TELEPHONE
(650) 327-9800

FAX
(650) 618-1863

October 22, 2012

**VIA EMAIL ONLY**
Arbitrators James E. Daniels, Judith Levin and Barbara A. Mentz
c/o Melanie Rutherford
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914
melanierutherford@adr.org

**Re:   Weber v. Article One Partners et al.; AAA Case No. 13 194 00649 12**

Dear Arbitrators:

This confirms that Ms. Weber wishes to amend her claim to reflect the change of Respondent Article One Partners, LLC's name to Article One Partners Holdings, LLC ("AOP") and to add Article One Founders, LLC ("AOP Founders") as an additional respondent. Ms. Weber further wishes to amend her arbitration claims to assert additional causes of action against Respondents, as follows:

## DECLARATORY RELIEF
### Against All Respondents

A case and controversy has arisen and now exists between Ms. Weber on the one hand and Respondents on the other, concerning their respective rights, duties and obligations. Ms. Weber contends that she is a member of the limited liability companies AOP and AOP Founders, and an owner of a fully vested 11% interest in AOP and the equivalent of 100,000 shares of AOP Founders. Ms. Weber further contends that upon the conversion of AOP to a corporation, she will be entitled to the issuance of stock certificates reflecting this fully vested interest. Ms. Weber also contends that she is entitled to access the records and financial information of AOP and AOP Founders, and to an accounting of all income and expenses of those entities. Respondents dispute this contention entirely and assert that Ms. Weber owns a smaller and/or non-vested interest in AOP and that Ms. Weber was never granted 100,000 shares of AOP Founders. Respondents further refuse to give Ms. Weber access to the records and financial information, or an accounting of the income and expenses, of AOP or AOP Founders.

A judicial declaration is necessary and appropriate at this time under the circumstances in order that Ms. Weber may ascertain her rights and interests with respect to ownership, as follows:

Tribunal c/o Melanie Rutherford
October 22, 2012
Page 2

    1.      That Ms. Weber has a fully vested ownership of 11% in AOP;

    2.      That Ms. Weber has a fully vested ownership of 100,000 share grant in AOP Founders;

    3.      That Ms. Weber has the right to access all shareholder and all financial information of AOP and AOP Founders; and

    4.      That Ms. Weber is entitled to an accounting of all income and expenses of AOP and AOP Founders.

### SECURITIES FRAUD
### Against Respondents Article One Partners Holdings, LLC, Article One Founders, LLC and Cheryl Milone

Ms. Weber is a purchaser of securities under section 10(b)-5 of Securities Exchange Act of 1934 because she has entered into various investment contracts with AOP, AOP Founders, and Cheryl Milone to invest in AOP and AOP Founders.

AOP, AOP Founders and Ms. Milone engaged in a fraudulent scheme to misrepresent or conceal material facts in connection with Ms. Weber's investment in AOP and AOP Founders and to induce Ms. Weber to purchase the stock of AOP and AOP Founders, including misrepresenting the value of the investment Ms. Weber made in AOP and AOP Founders by making statements to Ms. Weber which included (i) false promises in Spring of 2008 by Ms. Milone that if Ms. Weber joined the company as a founder, she would receive at least a 1% ownership interest in the company; (ii) written statements on December 21, 2008 that Ms. Weber was granted an additional 100,000 shares in the company in exchange for her work with the company; (iii) additional statements in February 2009 that the company required an immediate investment of $50,000 from Ms. Weber to avoid bankruptcy; (iv) statements asserting that with the value of this $50,000 investment, Ms. Weber would double her 5.5% interest in the company, separate from the 100,000 shares from December 21, 2008; (v) continually promising that the LLC would be converted to a corporation; (vi) repeatedly representing Ms. Weber would be provided with stock certificates for these shares; (vii) representing to Ms. Weber in Summer 2009 that in order to obtain financing for the company from SYW Investments LLC ("SYW"), Ms. Weber would have to convert her ownership to "stock options," and that unless she did so, there would be no way to close the transaction and save the company; and (viii) misrepresenting to Ms. Weber in September 2011 that a second round of financing from Alleghany Capital Corporation ("Alleghany") was not forthcoming, and that Ms. Weber's "options" could not, therefore, be exchanged for value, while such financing (a) had been used, in the Spring and Summer 2011 to influence the terms of Ms. Weber's continued investment during the negotiation of a separation agreement with AOP and (b) was, in fact, forthcoming, and concluded in February 2012.

By making these false statements and misrepresentations of material facts, AOP, AOP Founders, and Ms. Milone acted willfully and with the deliberate intent to induce Ms. Weber to invest in AOP and AOP Founders.

Tribunal c/o Melanie Rutherford
October 22, 2012
Page 3

Ms. Weber relied upon these misstatements and omissions of material fact in making her decision to invest in AOP and AOP Founders, and as a result was damaged and harmed when AOP and AOP Founders failed to make the promised conversion into a corporate entity, failed to honor its investment contracts with Ms. Weber, failed to issue stock certificates for her promised ownership interest in this entity, and repudiated Ms. Weber's ownership interest in AOP and AOP Founders limited liability companies.

**CONSTRUCTIVE FRAUD**
**Against Respondent Cheryl Milone**

By virtue of Ms. Milone's position as managing member of AOP and AOP Founders, the relationship between Ms. Milone and Ms. Weber was fiduciary in nature. Ms. Milone thereby owed Ms. Weber the fiduciary duties of loyalty and care, and the obligation to conduct their business in good faith and fair dealing. Because Ms. Weber's confidence in Ms. Milone's integrity caused Ms. Weber to entrust Ms. Milone with money and resources invested in AOP and AOP Founders at Ms. Milone's behest, a confidential relationship existed at all relevant times between Ms. Weber and Ms. Milone.

Ms. Milone breached her fiduciary duties to Ms. Weber in numerous ways, including, but not limited to: (i) failing and refusing, after repeatedly promising that Ms. Weber would join AOP as a founder, officer and investor, to acknowledge and confirm Ms. Weber's ownership in AOP and AOP Founders; (ii) refusing and failing to provide an accounting to Ms. Weber of the valuation of AOP and AOP Founders or to allow Ms. Weber access to the books and records of AOP or AOP Founders; (iii) refusing and failing to properly document Ms. Weber's ownership interest in AOP and AOP Founders; (iv) inducing Ms. Weber to invest money in, and to continue working for and on behalf of AOP and AOP Founders without this documentation and without compensation for many years by representing that Ms. Weber could trust Ms. Milone, that her ownership in and position with the company was secure, and that Ms. Weber would receive value for her contributions to the company in the form of properly documented and valued stock or other equity; and (v) entering into funding agreements with Respondents SYW and Alleghany while failing to protect Ms. Weber's interests or in a manner that served the best interests of Ms. Weber, but which were, in fact self-dealing transactions which put the interests of Ms. Milone, SYW and Alleghany ahead of Ms. Weber's.

Ms. Weber placed confidence in and relied on Ms. Milone until Ms. Weber realized the dishonest and wrongful practices of Ms. Milone. Until that time, Ms. Weber had reasonably relied on Ms. Milone's representations of honesty and integrity.

As a proximate result of Ms. Milone's constructive fraud, Ms. Weber has suffered damages in an amount to be proven at arbitration.

In performing the acts, or failing to perform, as alleged, Ms. Milone acted with oppression, fraud and malice, and Ms. Weber is entitled to punitive damages.

Tribunal c/o Melanie Rutherford
October 22, 2012
Page 4

**DECEIT**

**Against Respondents Article One Partners Holdings, LLC,
Article One Founders, LLC and Cheryl Milone**

Between 2007 and 2012, Ms. Milone, and AOP and AOP Founders, through their managing member Ms. Milone and other agents, affirmatively misrepresented the value of the ownership interest in AOP and AOP Founders which Ms. Weber would obtain in exchange for capital investment and the investment of her time and resources as a founder, officer and employee of the companies, and actively concealed or suppressed pertinent facts to prevent Ms. Weber from learning the truth about how the form, percentage and value of her ownership interest would be affected by the funding agreements and transactions between AOP and AOP Founders, on the one hand, and other investors, including SYW and Alleghany, on the other.

These misrepresentations and concealments included (i) false promises in Spring of 2008 by Ms. Milone that if Ms. Weber joined the company as a founder, she would receive a 1% ownership interest in the company; (ii) written statements on December 21, 2008 that Ms. Weber was granted an additional 100,000 shares in the company in exchange for her work with the company; (iii) additional statements in February 2009 that the company required an immediate investment of $50,000 from Ms. Weber to avoid bankruptcy; (iv) asserting that with the value of this $50,000 investment, Ms. Weber would double her 5.5% interest in the company, separate from the 100,000 shares from December 21, 2008; (v) continually promising that the LLC would be converted to a corporation; (vi) repeatedly representing Ms. Weber would be provided with stock certificates for these shares; (vii) representing to Ms. Weber in Summer 2009 that in order to obtain financing for the company from SYW, Ms. Weber would have to convert her ownership to "stock options," and that unless she did so, there would be no way to close the transaction and save the company; and (viii) misrepresenting to Ms. Weber in September 2011 that a second round of financing from Alleghany was not forthcoming, and that Ms. Weber's "options" could not, therefore, be exchanged for value, while such financing (a) had been used, in the Spring and Summer 2011 to influence the terms of Ms. Weber's continued investment during the negotiation of a separation agreement with AOP and (b) was, in fact, forthcoming, and concluded in February 2012.

Respondents AOP, AOP Founders and Ms. Milone knew of the materiality and falsity of these nondisclosures, concealments and misrepresentations. Their actions and inactions were taken with intent to induce reliance thereon by Ms. Weber, benefitting Respondents at her expense.

Ms. Weber reasonably relied upon these nondisclosures, concealments and misrepresentations and was induced to invest money in, and to continue working for and on behalf of AOP and AOP Founders, without the promised documentation and without compensation for many years.

Respondents' conduct was a substantial factor in inducing Ms. Weber to rely upon their false statements, misrepresentations and concealments, Ms. Weber does not have her rightful and proper ownership interest in AOP and AOP Founders, and suffered damages in an amount to be proven at arbitration, but which includes, but is not limited to, the value of this ownership interest and the amount of funds and resources invested by Ms. Weber in AOP and AOP

Tribunal c/o Melanie Rutherford
October 22, 2012
Page 5

Founders, in addition to any and all expenses incurred by Plaintiff in attempting to account for and recover this interest wrongfully denied her.

By their actions and conduct, Respondents are jointly and severally liable for damages suffered by Ms. Weber due to Respondents' deceitful acts, in an amount to be determined at arbitration.

The wrongful conduct of Respondents was egregious and carried on with willful and conscious disregard of Ms. Weber's rights, and was hence oppressive and malicious. As a result, Ms. Weber is entitled to punitive damages from Respondents.

## NEGLIGENT MISREPRESENTATION
### Against Respondents Article One Partners Holdings, LLC, Article One Founders, LLC and Cheryl Milone

Between 2007 and 2012, Ms. Milone, and AOP and AOP Founders, through their managing member Ms. Milone and other agents, made representations as to past or existing material facts regarding the value and form of Ms. Weber's ownership interest in AOP and AOP Founders, including (i) statements in February 2009 that the company required an immediate investment of $50,000 from Ms. Weber to avoid bankruptcy; (ii) statements regarding the value of this $50,000 investment, to the effect that Ms. Weber would double her 5.5% interest in the company, separate from the 100,000 shares from December 21, 2008; (iii) statements representing to Ms. Weber in Summer 2009 that in order to obtain financing for the company from SYW, Ms. Weber would have to convert her ownership to "stock options," and that unless she did so, there would be no way to close the transaction and save the company; and; (iv) misrepresenting to Ms. Weber in September 2011 that a second round of financing from Alleghany was not forthcoming, and that Ms. Weber's "options" could not, therefore, be exchanged for value, while such financing (a) had been used, in the Spring and Summer 2011 to influence Ms. Weber during the negotiation of a separation agreement with AOP and (b) was, in fact, forthcoming, and concluded in February 2012.

These representations were untrue as to the value of the ownership interest Ms. Weber would obtain in exchange for her $50,000 and the financial condition of the company, but regardless of her actual belief, Ms. Milone made these representations without any reasonable ground for believing them to be true.

These representations were made with intent to induce reliance thereon by Ms. Weber, to induce Ms. Weber to make the $50,000 investment in AOP and to sign agreements converting her existing ownership into "stock options."

Ms. Weber was unaware of the falsity of these representations, and acted in reliance upon the truth of these representations and was justified in relying upon these representations.

Ms. Weber reasonably relied upon these nondisclosures, concealments and misrepresentations and was induce to invest money in, and to continue working for and on behalf of AOP and AOP Founders, without the promised documentation and without compensation for many years.

Tribunal c/o Melanie Rutherford
October 22, 2012
Page 6

As a result of her reliance upon the truth of the representations, Ms. Weber sustained damages in an amount to be proven at arbitration, but which includes, but is not limited to, the value of this ownership interest and the amount of funds and resources invested by Ms. Weber in AOP and AOP Founders, in addition to any and all expenses incurred by Plaintiff in attempting to account for and recover this interest wrongfully denied her.

### BREACH OF CONTRACT
### Against Respondents Article One Partners Holdings, LLC, Article One Founders, LLC and Cheryl Milone

By 2011, Respondents Article One Partners Holdings, LLC, Article One Founders, LLC, Cheryl Milone and Frances Weber, had entered into binding written and oral agreements, including the written August 7, 2007 Subscription Agreement, the May 20, 2008 Operating Agreement of Article One Partners, LLC, the December 23, 2008 grant of 100,000 shares in Article One Founders, LLC by Ms. Milone, and the Second Amended and Restated Limited Liability Agreement of June 17, 2010 (the "Agreements"), to grant Ms. Weber a membership interest in AOP and AOP Founders, and an equivalent share of stock in the company when it converts to a corporation, in return for Ms. Weber's investments of money, time and work as a founder, employee and investor of AOP and AOP Founders.

Pursuant to the Agreements, Ms. Weber complied with each of her requirements under the Agreement, including capital contributions of $50,000 and over four years of work for the company as a founder, officer, and employee.

Ms. Weber's performance of her obligations under the Agreements occurred in a timely manner and fulfilled her obligations under the Agreements.

Despite Ms. Weber's performance and compliance with her obligations under the Agreements, Respondents AOP, AOP Founders, and Cheryl Milone have materially breached the Agreement by, among other actions and omissions, (i) refusing to give Ms. Weber access to the records of AOP and AOP Founders; (ii) refusing to give Ms. Weber an accounting of the value of her ownership interest in AOP and AOP Founders; and (iii) refusing to grant Ms. Weber an ownership in AOP and AOP Founders and repudiating Ms. Weber's rightful ownership interests in AOP and AOP Founders.

AOP, AOP Founders, and Cheryl Milone's actions and omissions in material breach of contract have harmed and damaged Ms. Weber in an amount to be proven at arbitration.

### BREACH OF FIDUCIARY DUTY
### Against Respondent Cheryl Milone

Respondent Milone, by virtue of her role as managing member of AOP and AOP Founders, owes Ms. Weber fiduciary duties of loyalty, care and good faith.

Ms. Milone breached her fiduciary duties to Ms. Weber in numerous ways, including, but not limited to: (i) failing and refusing, after repeatedly promising that Ms. Weber would join AOP as a founder, officer and investor, to acknowledge and confirm Ms. Weber's ownership in AOP and AOP Founders; (ii) refusing and failing to provide an accounting to Ms. Weber of the

Tribunal c/o Melanie Rutherford
October 22, 2012
Page 7

valuation of AOP and AOP Founders or to allow Ms. Weber access to the books and records of
AOP or AOP Founders; and (iii) refusing and failing to properly document Ms. Weber's
ownership interest in AOP and AOP Founders; (iv) inducing Ms. Weber to invest money in, and
to continue working for and on behalf of AOP and AOP Founders without this documentation
and without compensation for many years by representing that Ms. Weber could trust Ms.
Milone, that her ownership in and position with the company was secure, and that Ms. Weber
would receive value for her contributions to the company in the form of properly documented
and valued stock or other equity; and (v) entering into funding agreements with Respondents
SYW and Alleghany while failing to protect Ms. Weber's interests or in a manner that served the
best interests of Ms. Weber, but which were, in fact self-dealing transactions which put the
interests of Ms. Milone, SYW, and Alleghany ahead of Ms. Weber's.

By intentionally committing the acts set forth in the preceding paragraph, Ms. Milone has
breached the duty of care, loyalty, and good faith.

As a proximate result of Ms. Milone's breach of her duty of care, loyalty and good faith
to Ms. Weber, Ms. Weber does not have her rightful and proper ownership interest in AOP and
AOP Founders,  and suffered damages in an amount to be proven at arbitration, but which
includes, but is not limited to, the value of this ownership interest and the amount of funds and
resources invested by Ms. Weber in AOP and AOP Founders, in addition to any and all expenses
incurred by Plaintiff in attempting to account for and recover this interest wrongfully denied her.

In doing the acts alleged herein, Ms. Milone acted with oppression, fraud, and malice and
Ms. Weber is entitled to punitive damages in an amount as authorized by law.

### PRAYER FOR RELIEF

Ms. Weber prays for judgment on these additional claims as follows:

(1)    For declaration of her rights and interests as an investor and owner in AOP and AOP
         Founders;
(2)    For damages in an amount to be proven at hearing, but believed to be not less than $1,000,000;
(3)    For punitive and exemplary damages;
(4)    For an accounting;
(5)    For costs of suit and prejudgment interest on all damages awarded; and
(6)    For such other and further relief as is found proper.

Respectfully submitted,
COMPUTERLAW GROUP LLP

By: _____
        Jack Russo

Attorneys for Claimant FRANCES WEBER

Cc: Jeffrey Liddle, Esq., Michael Grenert, Ph.D., Michael McDonald, Esq.

# EXHIBIT 10

| | Page 1 |
|---|---|
| **From:** | "Michael Grenert" <mgrenert@liddlerobinson.com> |
| **To:** | "Melanie Rutherford" <melanierutherford@adr.org> |
| **Date:** | 10/26/2012 4:50:14 PM |
| **Subject:** | RE: Weber v. Article One (13 194 00649 12) |

Dear Arbitrators:

1) Respondents object to Claimant's filing her amended claims dated October 22, 2012 on the following grounds:

    a)  Claimant did not request the Arbitrators' consent, which is required under AAA Commercial Rule R-6;

    b)  the Panel's Procedural Order No. 1 provided in paragraph 3 that "Respondents are given until ten days after receipt of this Panel's ruling on the Respondents' motion to dismiss to respond to Claimant's Demand and to file counterclaims, if any. Claimant is given until ten days thereafter to reply to any counterclaims, if Claimant so chooses. The pleadings will be closed at that point, with no further claims or counterclaims permitted except on good cause shown.", and since the Panel's ruling was on September 21, 2012 and Respondents did not file counterclaims, the pleadings have been closed for 3 and ½ weeks since October 1, 2012, and good cause has not been shown;

    c)  while the Panel "noted the footnote in Respondents' Reply of September 19, 2012 stating that Article One Partners, LLC —the entity Claimant has named as a Respondent—changed its name to Article One Partners Holdings, LLC on October 10, 2008," and gave Claimant "until October 19 if she wishes to amend her demand to reflect the asserted name change," the amendment contemplated by the Panel was clearly just a change in the name of a Respondent, not a wholesale addition of multiple claims and requests for monetary damages.

    d)  good cause does not exist because the parties extensively briefed the issue of the arbitrability of Claimant's original claims and the Arbitrators already ruled upon that issue to determine what claims are in the arbitration and what claims are not, and at least some of the claims and remedies Claimant seeks in her amended claims are not arbitrable (for example, she again seeks punitive damages and costs despite the Arbitrators having already ruled that such claims were not arbitrable); and

    e)  good cause further does not exist because Claimant's original claims sought only declaratory relief, apparently as a way of limiting the fees she would be charged by the AAA, and now she has added multiple claims seeking $1,000,000 in damages (while Claimant filed a Declaration in support of her motion to switch from the Commercial to the Employment Rules swearing that she was "unable financially to pay the higher administrative fees and share of the arbitrator fees required by the Commercial Rules," now she seeks to file amended claims that will result in significantly higher fees to her).

2) Respondents object to Claimant's October 25, 2012 request to extend the October 26 deadline for expert disclosures and reports on the following grounds:

    a)  while Claimant blames its supposed inability to meet the deadline on Respondents not have produced documents yet, the Panel's Procedural Order No. 1 set October 26 as the deadline for expert disclosures and reports and November 2 for the production of documents, so the deadline for Respondents to produce documents has not passed;

    b)  Claimant states that her expert will be on damages, and based on her complaints about Respondents' object to 2 of 12 categories of document requests, her expert will be on the valuation of her alleged ownership interest, but her original claims were only for declarations, including of her ownership interest, not for monetary damages, and a valuation expert is not necessary for claims for declarations rather than monetary damages.

Michael E. Grenert
Liddle & Robinson, L.L.P.
800 Third Avenue
New York, N.Y. 10022
(212) 687-8500 Ext. 251
Fax (212) 687-1505
www.liddlerobinson.com
http://www.liddlerobinson.com/attorneys/partners/michael-grenert/

*The information contained in this e-mail message, and any attachments, may be confidential and legally privileged, and is intended only for use by the individual(s) or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (212-687-8500), and destroy the original message. Thank you.*

---

**From:** Joyce Chang [mailto:jchang@computerlaw.com]
**Sent:** Thursday, October 25, 2012 9:03 PM
**To:** Melanie Rutherford
**Cc:** Jack Russo; Chris Sargent; Lucy Goodnough; Tim Crawley; Fran Weber; Michael Grenert; Jeffrey Liddle; Matthew McDonald
**Subject:** Weber v. Article One (13 194 00649 12)

Dear Arbitrators:

Attached please find a letter from Mr. Russo.

Best regards,

Joyce Chang
Legal Assistant
Computerlaw Group LLP
401 Florence Street
Palo Alto, CA 94301
Tel: (650) 617-0246
Fax: (650) 618-1863

# EXHIBIT 11

# AMERICAN ARBITRATION ASSOCIATION

## Commercial Arbitration Tribunal

-----------------------------------------------------x

FRANCES WEBER,                                  :

        Claimant,                              :     Case No. 13 194 00649 12

     and                                         :

ARTICLE ONE PARTNERS, LLC, et al, :

       Respondents.                        :

-----------------------------------------------------X

## PROCEDURAL ORDER NO. 2

A Preliminary Hearing was held in this arbitration proceeding on November 06, 2012, commencing at 4:00 PM Eastern time. The hearing was conducted by telephone. The following persons participated in the call:

Jack Russo, Esq., Lucy Goodnough (law clerk) and Joyce Chang (paralegal) from the firm Computerlaw Group LLP, on behalf of Claimant;

Michael E. Grenert, Esq. and Matthew J. McDonald, Esq. from the firm Liddle & Robinson, L.L.P., on behalf of all Respondents except General Catalyst Partners;

Michael Sheetz, Esq. from the firm Cooley LLP for Respondent General Catalyst Partners;

Arbitrators: James E. Daniels, Esq. (Chair), Barbara A. Mentz, Esq. and Judith Levin, Esq.; and

Derek Coppola, AAA Case Manager.

After full discussion and review of the submissions of the parties, and by order of this Panel of Arbitrators, the parties are directed to comply with the following schedule and procedures:

1.    Based on time estimates provided by counsel and to accommodate problems caused by Hurricane Sandy, the hearing dates of December 3 and 4, 2012 are cancelled.  Hearings will begin on December 5, at 10:00 AM and continue day to day on the dates set out in Procedure Order No. 1 ("Order 1").

2.    Claimant's October 22, 2012 letter application to amend Claimant's demand to i) reflect the name change of Article One Partners LLC to Article One Partners Holdings LLC (AOP); ii) add an additional Respondent, namely Article One Founders, LLC ("Founders") and iii) add additional causes of action is denied in part and granted in part, as follows:

Under AAA Commercial Arbitration Rule R-6, a party must obtain the Panel's consent to any amendment of claims at this stage of the proceedings.  Furthermore, under paragraph 3 of Order 1, good cause for the amendment must be shown.

The Panel consents and permits the Amendment to change the name of Respondent Article One Partners LLC to Article One Partners Holdings LLC (AOP).

The Panel finds good cause has been established to permit the Amendment to add the additional Respondent Article One Founders, LLC.

Claimant failed to establish good cause that would warrant consent to the proposed amendments denominated as follows: "Securities Fraud", "Constructive Fraud", "Deceit", "Negligent Misrepresentation", "Breach of Contract", and "Breach of Fiduciary Duty".  The elements of these proposed additional claims were well-known to Claimant for months and Claimant took no action to request the Claim be amended. Claimant did not present sufficient cause to permit the amendment of the claim to add these claims at this late date.   The Panel is mindful of the goal of arbitration to conduct a full and fair hearing of contractual disputes in ways that are expeditious and less costly than litigation. Permitting the amendment to add these claims, without good cause, would result in an extensive delay in conducting the hearings, and likely result in extensive additional costs to the parties. The Panel notes that Claimant's counsel in the preliminary conference did not request an adjournment of the hearing dates but expressed a desire to maintain the hearing dates but merely extend dates for other procedural matters.

The Panel consents to and permits the additional claim denominated "Declaratory Relief Against All Respondents" on the basis that it describes in further and helpful detail the claims contained in Claimant's initial demand and its inclusion in the pleadings will not have any material adverse affect on the progress of these proceedings.

3.     The parties are directed to complete their document production by close of business on November 16, 2012.  Any remaining disputes are to be brought to the Panel through a joint submission (as described in paragraph 4 of Order 1) on or before November 21, 2012.

4.     The date of November 15, 2012 for the parties to exchange their documentary exhibits in paragraph 8  of Order 1 is extended to November 27, 2012.  In all other respects, paragraph 8 of Order 1 remains in place.   The arbitrators will advise the parties through AAA at some later date as to the specific time and manner in which they want to receive their copies of the exhibits.

5.     Given the Panel's ruling on the proposed amendments, the Panel defers any ruling on the admission of expert evidence which Claimant may intend to offer. However, the date for submission of expert reports is extended to November 23, 2012 and the date for any rebuttal reports is left open for later resolution. It is possible that the Panel may keep the record open after December 14, 2012 to hear expert testimony.

6.     The Panel will not accept pre-hearing briefs.  Instead, counsel will each be given forty-five minutes at the start of the evidentiary hearing on December 5, 2012 to give opening statements.

7.     Claimant's and Respondents' Counsel have each stated that they currently do not intend to have a stenographic record made.   However, should that situation change, the parties are reminded of Commercial Arbitration Rule R-26, which must be followed.  The Panel will not permit taping machines supplied by the parties in the hearing room.

8.     Counsel for General Catalyst participated in the conference call and requested clarification of the Panel's prior ruling that the motion was denied with leave to renew after discovery of documents by Claimant.  No further ruling was made on the request for dismissal of General Catalyst  and Counsel for General Catalyst was directed to confer with Counsel for Claimant in connection with the status of production of documents requested by Claimant related to General Catalyst.

9.     At the time that witness lists are exchanged in accordance paragraph 9 of Order 1, the lists must be filed promptly with AAA so that the arbitrators can make a conflict check.

10.     All provisions of Procedure Order No. 1 that are not specifically modified herein remain in place.

Dated: November 08, 2012

James E. Daniels

Judith Levin

Barbara A. Mentz

THE ARBITRATION PANEL